**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

ALTISOURCE S.À R.L., ALTISOURCE
ONLINE AUCTION, INC., and REALHOME
SERVICES AND SOLUTIONS, INC.,

      Plaintiffs,

v.

MADRAMOOTHU CHINAPEN A/K/A
RICHIE CHINAPEN, VORO LLC, ROSA
RAMGOBIN A/K/A ROSA CHINAPEN, 912
EAST GROUP CORP, 14 POTTERS GROUP
CORP, HORN LANE GROUP CORP,
CANTERBURY DRIVE GROUP CORP,
3537 DANIEL CRESCENT GROUP CORP,
204 1ST AVENUE GROUP CORP, TWIN
RIVER GROUP CORP, ROBBY LANE
GROUP CORP, LINCOLN 155 GROUP
CORP, 38 LELAND GROUP CORP, 25
PARMA GROUP CORP, AMC83S GROUP
CORP, NORTH SPUR GROUP CORP, 612
MILLER AVE GROUP CORP,
SEAFORD2221 GROUP CORP, 10
HOLLYWOOD GROUP CORP, BOOTH11
GROUP CORP, CHIPS COURT GROUP
CORP, GREAT NECK12 GROUP CORP,
OLDER2 GROUP CORP, SAVE144 GROUP
CORP, 2068 ARTHUR GROUP CORP,
LFA1880 GROUP CORP, AMC66P GROUP
CORP, OSSI1138 GROUP CORP, OAKA26
GROUP CORP, ROSE100 GROUP CORP,
670 ELTON GROUP CORP,
3722 63RD LLC, RAKHI SINGH SHELDON
MAY & ASSOCIATES, P.C., ALYSSA
NGUYEN, TUNG NGUYEN, NORMAN
REMEDIOS, DAVID TORRES AND
YVETTE MALILAY,

      Defendants.

CIVIL ACTION NO.: _____

**COMPLAINT**

Altisource S.à r.l. ("Altisource"), Altisource Online Auction, Inc. ("AOA") and REALHome Services and Solutions, Inc. ("RHSS, " collectively with Altisource and AOA, "Plaintiffs") by and through their undersigned attorneys, for their Complaint against Defendants Madramoothu Chinapen a/k/a Richie Chinapen ("Chinapen"), and Voro LLC (collectively with Chinapen, "Buying Agent Defendants"); Rosa Ramgobin a/k/a Rosa Chinapen ("Ramgobin"), 912 East Group Corp, 14 Potters Group Corp, Horn Lane Group Corp, Canterbury Drive Group Corp, 3537 Daniel Crescent Group Corp, 204 1st Avenue Group Corp, Twin River Group Corp, Robby Lane Group Corp, Lincoln 155 Group Corp, 38 Leland Group Corp,  25 Parma Group Corp, AMC83S Group Corp, North Spur Group Corp, 612 Miller Ave Group Corp, Seaford2221 Group Corp, 10 Hollywood Group Corp, Booth11 Group Corp, Chips Court Group Corp, Great Neck12 Group Corp, Older2 Group Corp, Save144 Group Corp, 2068 Arthur Group Corp, LFA1880 Group Corp, AMC66P Group Corp, OSSI1138 Group Corp, Oaka26 Group Corp, Rose100 Group Corp, 670 Elton Group Corp, defendant 3722 63rd LLC and Rakhi Singh (collectively, "Buyer Defendants"); Sheldon May & Associates, P.C. ("Sheldon May"), Alyssa Nguyen and Tung Nguyen (collectively with Sheldon May, "Closing Agent Defendants"); Norman Remedios, David Torres and Yvette Malilay (collectively, "Conspiring Employee Defendants") (Buying Agent Defendants, Buyer Defendants, Closing Agent Defendants and Conspiring Employee Defendants are collectively referred to herein as "Defendants") state as follows, on knowledge as to themselves and on information and belief as to all other matters, which are likely to have evidentiary support after a reasonable opportunity for discovery:

## INTRODUCTION

1.     This matter arises out of Defendants' criminal racketeering scheme to manipulate plaintiff AOA's online property marketing and auction platform, Hubzu, to allow the Buyer Defendants to purchase properties throughout the State of New York at prices below fair market value in exchange for kickback payments and other valuable consideration to the Conspiring Employee Defendants and Closing Agent Defendants.

2.     During the disruption of ordinary business operations caused by the Covid-19 pandemic and resulting shelter-in-place orders, the Defendants executed their scheme by: (i) disclosing confidential reserve prices established by property sellers; (ii) submitting fraudulent bids well above fair market value to artificially inflate the bid amounts being placed on properties and thereby drive away bona fide competing bidders; (iii) disregarding bona fide third party bids on the pretext that they were harmful bidders; (iv) fraudulently inducing Plaintiffs' seller clients to accept prices below fair market value to compensate for non-existent defects and valuation concerns; and (v) providing excessive and unauthorized seller credits at closing to reduce the price for the benefit of the conspiring Defendants.

3.     Defendants succeeded in fraudulently purchasing at least 33 properties through their conspiracy, causing Plaintiffs and their seller clients to suffer extensive damages including, among others: (i) the difference between the price that should have been paid for the properties and the price the Buyer Defendants actually paid; (ii) reduced commissions and buyers' premiums payable to Plaintiffs and their affiliates; (iii) interference with Plaintiffs' business relationships with sellers and participants in the Hubzu auction process; (iv) Plaintiffs' loss of reputation and good will and the damage caused to the Hubzu platform; and (v) the attorneys' fees and other expenses Plaintiffs incurred as a result of Defendants' conspiracy and misconduct.

4.     Because Defendants utilized countless wire transmissions across state lines and into foreign countries to carry out their conspiracy, Defendants are jointly and severally liable under the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.* ("RICO") for three times the damages suffered by Plaintiffs, as well as Plaintiffs' attorneys' fees and costs.

## PARTIES, JURISDICTION AND VENUE

5.     Plaintiff Altisource Solutions S.a r.l., is a limited liability company duly organized and existing under the laws of Luxembourg, with its principal place of business located in Luxembourg.

6.     Plaintiff Altisource Online Auction, Inc. is a corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business located in Atlanta, Georgia.

7.     Plaintiff REALHome Services and Solutions, Inc. is a corporation duly organized and existing under the laws of the State of Florida, with its principal place of business located in Atlanta, Georgia.

8.     Defendant Madramoothu Chinapen is a citizen of New York who resides in Queens County, New York.

9.     Defendant Voro LLC is a limited liability company duly organized and existing under the laws of the State of New York, with its principal place of business located at 404 Glen Cove Avenue, Suite 202, Sea Cliff, New York, 11579.  Voro LLC is an entity associated with defendant Chinapen and Chinapen signed several property transaction documents on behalf of Voro LLC.

10.     Defendant Rosa Ramgobin a/k/a Rosa Chinapen is a citizen of New York who resides in Queens County, New York.

11.     Defendant 912 East Group Corp is a corporation duly organized and existing under the laws of the State of New York, with its principal place of business located at 104-37 108 Street, S. Richmond Hill, New York, 11419.

12.     Defendant 14 Potters Group Corp is a corporation duly organized and existing under the laws of the State of New York, with its principal place of business located at 177A E. Main Street, Suite 176, New Rochelle, New York 10801.

13.     Defendant Horn Lane Group Corp is a corporation duly organized and existing under the laws of the State of New York, with its principal place of business located at 104-37 108 Street, S. Richmond Hill, New York, 11419.

14.     Defendant Canterbury Drive Group Corp is a corporation duly organized and existing under the laws of the State of New York, with its principal place of business located at 104-37 108 Street, S. Richmond Hill, New York, 11419.

15.     Defendant 3537 Daniel Crescent Group Corp is a corporation duly organized and existing under the laws of the State of New York, with its principal place of business located at 87-58 111 Street, Richmond Hill, New York 11418.

16.     Defendant 204 1st Avenue Group Corp is a corporation duly organized and existing under the laws of the State of New York, with its principal place of business located at 104-37 108 Street, S. Richmond Hill, New York, 11419.

17.     Defendant Twin River Group Corp is a corporation duly organized and existing under the laws of the State of New York, with its principal place of business located at 104-37 108 Street, S. Richmond Hill, New York, 11419.

18.     Defendant Robby Lane Group Corp is a corporation duly organized and existing under the laws of the State of New York, with its principal place of business located at 104-37 108 Street, S. Richmond Hill, New York, 11419.

19.     Defendant Lincoln 155 Group Corp is a corporation duly organized and existing under the laws of the State of New York, with its principal place of business located at 104-37 108 Street, S. Richmond Hill, New York, 11419.

20.     Defendant 38 Leland Group Corp is a corporation duly organized and existing under the laws of the State of New York, with its principal place of business located at 10437 108th Street, 1st Floor, S. Richmond Hill, New York 11419.

21.     Defendant 25 Parma Group Corp is a corporation duly organized and existing under the laws of the State of New York, with its principal place of business located at 104-37 108 Street, S. Richmond Hill, New York, 11419.

22.     Defendant AMC83S Group Corp is a corporation duly organized and existing under the laws of the State of New York, with its principal place of business located at 104-37 108 Street, S. Richmond Hill, New York, 11419.

23.     Defendant North Spur Group Corp is a corporation duly organized and existing under the laws of the State of New York, with its principal place of business located at 104-37 108 Street, S. Richmond Hill, New York, 11419.

24.     Defendant 612 Miller Ave Group Corp is a corporation duly organized and existing under the laws of the State of New York, with its principal place of business located at 104-37 108 Street, S. Richmond Hill, New York, 11419.

25.     Defendant Seaford2221 Group Corp is a corporation duly organized and existing under the laws of the State of New York, with its principal place of business located at 104-37 108 Street, S. Richmond Hill, New York, 11419.

26.     Defendant 10 Hollywood Group Corp is a corporation duly organized and existing under the laws of the State of New York, with its principal place of business located at 104-37 108 Street, S. Richmond Hill, New York, 11419.

27.     Defendant Booth11 Group Corp is a corporation duly organized and existing under the laws of the State of New York, with its principal place of business located at 104-37 108 Street, S. Richmond Hill, New York, 11419.

28.     Defendant Chips Court Group Corp is a corporation duly organized and existing under the laws of the State of New York, with its principal place of business located at 104-37 108 Street, S. Richmond Hill, New York, 11419.

29.     Defendant Great Neck12 Group Corp is a corporation duly organized and existing under the laws of the State of New York, with its principal place of business located at 10437 108th Street, S. Richmond Hill, New York, 11419.

30.     Defendant Older2 Group Corp is a corporation duly organized and existing under the laws of the State of New York, with its principal place of business located at 10437 108th Street, S. Richmond Hill, New York, 11419.

31.     Defendant Save144 Group Corp is a corporation duly organized and existing under the laws of the State of New York, with its principal place of business located at 177A E. Main Street, Suite 176, New Rochelle, New York 10801.

32.      Defendant 2068 Arthur Group Corp is a corporation duly organized and existing under the laws of the State of New York, with its principal place of business located at 104-37 108 Street, S. Richmond Hill, New York, 11419.

33.      Defendant LFA1880 Group Corp is a corporation duly organized and existing under the laws of the State of New York, with its principal place of business located at 10437 108th Street, S. Richmond Hill, New York, 11419.

34.      Defendant AMC66P Group Corp is a corporation duly organized and existing under the laws of the State of New York, with its principal place of business located at 104-37 108 Street, S. Richmond Hill, New York, 11419.

35.      Defendant OSSI1138 Group Corp is a corporation duly organized and existing under the laws of the State of New York, with its principal place of business located at 10437 108th Street, S. Richmond Hill, New York, 11419.

36.      Defendant Oaka26 Group Corp is a corporation duly organized and existing under the laws of the State of New York, with its principal place of business located at 10437 108th Street, S. Richmond Hill, New York, 11419.

37.      Defendant Rose100 Group Corp is a corporation duly organized and existing under the laws of the State of New York, with its principal place of business located at 104-37 108 Street, S. Richmond Hill, New York, 11419.

38.      Defendant 670 Elton Group Corp is a corporation duly organized and existing under the laws of the State of New York, with its principal place of business located at 104-37 108 Street, S. Richmond Hill, New York, 11419.

39.     Defendant 3722 63rd LLC is a limited liability company duly organized and existing under the laws of the State of New York, with its principal place of business located at 104-37 108 Street, S. Richmond Hill, New York, 11419.

40.     Defendant Rakhi M Singh is a citizen of New York who resides in Queens County, New York.

41.     Defendant Sheldon May & Associates, P.C. is a professional corporation with its principal place of business located at 255 Merrick Road, Rockville Centre, New York 11570.

42.     Defendant Allysa Nguyen is a citizen of New York who resides in Nassau County, New York.  Allysa Nguyen is a paralegal at Sheldon May.

43.     Defendant Tung Nguyen is a citizen of New York who resides in Nassau County, New York.

44.     Defendant Norman Remedios is a citizen of Mumbai, India.

45.     Defendant David Torres is a citizen of New Jersey who resides in Essex County, New Jersey.

46.     Defendant Yvette Malilay is a citizen of Georgia who resides in Fulton County, Georgia.

47.     The Court has personal jurisdiction over each of the Defendants because they have transacted business within the State of New York, including the transactions at issue in this litigation, have committed tortious acts within the State of New York and all of the Defendants with the exception of Norman Remedios, David Torres and Yvette Malilay reside in the State of New York.

48.     The Court has subject matter jurisdiction over the RICO claims under 28 U.S.C. § 1331 and 18 U.S.C. § 1964(a), and over the related state-law claims under 28 U.S.C. § 1367.

49.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because the majority of the Defendants reside in this District and all of the Defendants with the exception of Norman Remedios, David Torres and Yvette Malilay are residents of the State of New York where this District is located.  Venue is also proper in this District under 28 U.S.C. § 1391(b)(1) because a substantial part of the events or omissions giving rise to the claims occurred here and a substantial part of the properties that are the subject of this action are situated here.

## **GENERAL ALLEGATIONS**

### *The Hubzu Online Property Marketing and Auction Platform*

50.     Plaintiff Altisource is an integrated service provider and marketplace for the real estate and mortgage industries.  Altisource is the parent company of plaintiffs AOA and RHSS.

51.     Plaintiff AOA operates Hubzu, one of the largest online home auction marketing platforms for licensed real estate brokers and sellers to market properties and manage bids for those properties.  Hubzu, which is hosted on the website www.hubzu.com, allows sellers to market their inventory directly to serious buyers and investors, obtain and evaluate bids, and use technology to streamline transactions.

52.     Sellers that desire to auction properties on Hubzu provide available information regarding the property and set a starting bid price that is disclosed on the Hubzu platform. Sellers also set a confidential reserve price that is disclosed to a limited number of employees who work for Plaintiffs but is not disclosed to bidders or made publicly available in any way.

53.     In most cases – *including with respect to all of the properties relevant to this action* –properties marketed on the Hubzu platform are also listed for sale on a multiple listing service property database ("MLS") accessible to real estate brokers and agents.

54.     Potential purchasers that desire to bid on a property through the Hubzu platform register their contact information and then submit their bids electronically through the platform.

55.     A single auction "cycle" on the Hubzu platform typically lasts seven days unless the seller specifically requests a different duration.  It is not uncommon for a property to have multiple auction cycles before the seller accepts a bid.

56.     A given auction cycle may conclude with no bids on the property, one or more bids below the confidential reserve price, one or more bids above the confidential reserve price, or a combination of the latter two.

57.     At the end of the auction cycle, the seller has the right, in its sole discretion, to decide whether to invite a bidder to enter into a purchase and sale agreement ("PSA"). The conclusion of the auction does not give the prevailing bidder a legal or contractual right to purchase the property. A contract to purchase the property is created only if both the seller and bidder execute a PSA.

58.     The seller has no obligation to accept a particular bid, including the highest bid. The seller can also reject all bids and elect to place the property back into auction for another auction cycle or remove the property from Hubzu altogether and explore alternative channels for disposition of the property.

59.     If the bidder's price exceeds the reserve price and satisfies other seller criteria, then the bidder and seller may negotiate and execute a PSA.

60.     With respect to the properties that are the subject of this action (the "Impacted Properties," as defined below), PHH Mortgage Corporation acted as the agent of the sellers and signed the PSAs on their behalf.

61.     From time to time, a prevailing bidder may "fall out" if the bidder refuses to honor its bid or fails to respond to enter into a PSA.  The seller, at its sole discretion, can then negotiate a PSA with a different bidder, place the property back into auction for another auction cycle, or remove the property from Hubzu altogether and explore alternative channels for disposition of the property.

62.     Plaintiff AOA, which operates the Hubzu platform, receives a "buyer's premium" for properties that are marketed on Hubzu in an auction marketing format which result in a consummated sale. The buyer pays the buyer's premium in addition to the purchase price for the property.

63.     Plaintiff RHSS, as the listing broker for properties marketed on Hubzu, receives all or a portion of the listing broker commission that is paid on consummated sales. The listing broker commission is deducted from the proceeds of the sale.

64.     Prospective buyers who register to use the Hubzu auction platform unconditionally agree to Hubzu's terms and conditions.  A true and correct copy of Hubzu's terms and conditions is attached hereto as **Exhibit A.**

65.     Among other things, Hubzu's terms and conditions require bidders to comply with all applicable local, state, federal and international laws, statutes, ordinances and regulations regarding their use of Hubzu and its affiliated websites.

66.     Prospective buyers also accept and agree to the following indemnification obligation as a condition of bidding on the Hubzu platform:

> You agree to indemnify, defend and hold the Seller, the Licensed Real Estate Agent, Altisource, AOA and their respective parents, subsidiaries, affiliates, officers, directors, agents, employees, and representatives harmless from any claim or demand, including a claim for attorneys' fees, made by any third party due to, or arising out of, (a) your breach of any terms of this Agreement or any of the documents incorporated by reference herein, (b) your acts or omissions in

connection with your use of Hubzu, (c) your negligence, gross negligence, willful misconduct, (d) your violation of any law, rule or regulation or (e) your violation of the rights of a third party.

*Defendants' Conspiracy to Manipulate Hubzu Auctions and Property Sales*

67.     Beginning in or around January 2020, Defendants devised and initiated their scheme to manipulate the Hubzu platform to purchase residential properties at prices below fair market value that could not be obtained by ordinary and lawful participation in an auction marketing format consistent with Hubzu's governing terms and conditions.

68.     Specifically, the Buying Agent Defendants, the Buyer Defendants and the Closing Agent Defendants conspired with at least three then-current (now former) employees of Plaintiffs – Norman Remedios, David Torres and Yvette Maliliay – to manipulate the Hubzu platform and defraud Plaintiffs and their seller clients.

69.     Defendant Norman Remedios ("Remedios"), Senior Manager, Asset Management - Settlement Oversight was one of the primary participants in the conspiracy.  By virtue of his position, Remedios had access to confidential information and operations that allowed him to, among other things, access the reserve price, obtain bidders' contact information, request downward pricing adjustments, persuade sellers to accept artificially depressed prices, falsely identify legitimate bidders as harmful, and request or approve seller credits, all of which Remedios used to perpetrate the fraud described herein.  Certain other Defendants paid illegal kickback payments to Remedios for his participation in furtherance of their fraudulent conspiracy and its objectives.

70.     Defendant Yvette Malilay ("Malilay"), Asset Management Specialist and Coordinator, introduced Remedios to certain of the Buying Agent Defendants and Buyer Defendants. She also furthered Defendants' conspiracy by helping to facilitate certain fraudulent

transactions and illegal kickback payments from one or more Buying Agent Defendants and Buyer Defendants.

71.     In the ordinary course of her job duties, Malilay communicated with buyers and their agents to address property deed issues that arose in connection with their transactions.

72.     On at least one occasion, after a buyer expressed dissatisfaction with Hubzu and inquired whether there was any other way to purchase properties, Malilay instructed the buyer to contact Remedios who would circumvent the normal process and negotiate the sale of properties at below market prices using back channel methods.

73.     Defendant David Torres ("Torres"), a senior broker for RHSS in New York, acted as the intermediary between the Buying Agent Defendants, the Buyer Defendants, and the Closing Agent Defendants, on the one hand, and Remedios, on the other hand, to share confidential information and facilitate the fraudulent transactions.  Behind the scenes, Torres would communicate with Chinapen, directly or through one of Chinapen's agents, Remedios and other Defendants about their conspiracy by sharing confidential pricing information and discussing ways to sell the properties to the Buyer Defendants at significantly discounted prices. Torres would then try to make the fraudulent transactions look legitimate on the surface by sending and receiving emails, purportedly on behalf of the seller, that would falsely suggest that the terms of the transaction arose organically by ordinary means.  For example, if Remedios and Torres revealed the reserve price to Chinapen and told Chinapen during private conversations that he could purchase the property for $1,000 over the reserve price, Chinapen would have one of his agents send an "official" email to Torres stating that they would purchase the property for the secretly negotiated price, and Torres would send follow-up emails internally at Altisource and to Chinapen or one of Chinapen's agents acting as if he thought the offer was legitimate.

74.     The Defendants employed several different tactics to execute their fraudulent scheme:

    a.  The Buying Agent Defendants and Buyer Defendants would procure fraudulent and excessive bids that the particular bidder had no intention of ever paying, for the purpose of driving the price sufficiently high to discourage legitimate bidders from bidding on the property, thereby creating an opportunity for the Buyer Defendants to coordinate with the Conspiring Employee Defendants to purchase the property for less than fair market value when the fraudulent bidder inevitably "fell out" of the auction;

    b.  The Conspiring Employee Defendants would disclose confidential property information to the Buying Agent Defendants, the Buyer Defendants and/or the Closing Agent Defendants, including reserve prices for the properties, to allow the Buyer Defendants to purchase properties at prices as close as possible to the reserve price;

    c.  The Buying Agent Defendants, the Buyer Defendants and/or the Closing Agent Defendants would falsely identify a problem with a property that allegedly decreased its value.   Remedios would then knowingly and intentionally misrepresent the existence of the issue to the seller to induce the seller to approve an unwarranted reduction in price;

    d.  Remedios would apply excessive and unauthorized seller credits at closing to reduce the final sale price for the benefit of the Buyer Defendants and the rest of the conspirators; and

    e.  Remedios would ignore higher auction bids in favor of the Buyer Defendants and/or the Buying Agent Defendants, thereby clearing the path for the Buyer Defendants to purchase the properties.

*Defendants' Scheme Uncovered*

75.     In or around July 2020, Plaintiffs received their first indication of Defendants' fraudulent conduct when a third-party bidder (the "Third Party Bidder") not associated with Defendants emailed a RHSS broker to complain that defendant Chinapen was engaged in fraud in connection with the auction and sale of a property located at 35 Chestnut Stump Road, Fort Salonga, NY 11768 (the "35 Chestnut Property").

76.     The Third Party Bidder had submitted a bid on the 35 Chestnut Property in each of five auction cycles between April 18, 2020 and June 15, 2020.  None of his bids met the seller's confidential reserve price, but the Third Party Bidder was able to see that no other bids were submitted for the property during those five cycles.

77.     Then, on June 17, 2020, defendant Chinapen called the Third Party Bidder and told him that he had secured the contract to purchase the 35 Chestnut Property.  Chinapen also implied that the Third Party Bidder could buy the property from Chinapen.

78.     The next day, defendant Ramgobin – who, on information and belief, is related to defendant Chinapen and resides at the same address – incorporated Chestnut Stump Group Corporation as a New York corporation for the purpose of purchasing the 35 Chestnut Property.

79.     Independent from the Hubzu platform, on June 23, 2020, the MLS listing price for the 35 Chestnut Property was reduced to $1,100,000.

80.     That same day another auction cycle started for the 35 Chestnut Property on Hubzu.  This time, the Third Party Bidder was not the sole bidder.  Another bidder, defendant Singh, was now also vying for the 35 Chestnut Property.

81.     The Third Party Bidder submitted a bid for the newly-reduced MLS listing price of $1,100,000, but Singh outbid the Third Party Bidder.  A bidding war ensued, with Singh eventually submitting the high bid for the auction at $1,304,000 before the auction closed on June 30.

82.     Singh ceased all communication on the Hubzu platform following the conclusion of the auction and failed to follow through with the sale after having submitted numerous bids above the MLS listing price to increase the auction price beyond the amount that the Third Party Bidder was willing to pay.

83.     On July 4, 2020, only four days after the auction ended, defendant Ramgobin executed a PSA on behalf of Chestnut Stump Group and scheduled the closing for July 30, despite the fact that Ramgobin had not ever bid on the 35 Chestnut Property.   The price established by the PSA was $950,000 -- $354,000 less than Singh's high bid and $150,000 less than the Third Party Bidder's highest bid.

84.     On July 7, 2020, the Third Party Bidder contacted a RHSS broker and told him he believed that Chinapen had approached him on June 17 about flipping the 35 Chestnut Property, despite the fact that it was not yet under contract and still listed for sale.   The broker relayed the notification to the appropriate compliance team at Altisource for further investigation.

85.     Meanwhile, the closing for Chestnut Stump Group Corp's purchase of the 35 Chestnut Property was pushed back to August 28, 2020, and then a second time to September 18.

86.     On August 29, 2020, Chinapen called the Third Party Bidder and told him that Chinapen's "client," Chestnut Stump Group Corp, would sell the Third Party Bidder the rights to purchase the 35 Chestnut Property for $1,100,000 – the exact amount of the Third Party Bidder's highest bid for the property.

87.     The Third Party Bidder accepted Chinapen's offer and sent him contact information for the Third Party Bidder's counsel to draw up the requisite paperwork.

88.     On September 9, Chinapen's counsel sent the Third Party Bidder's counsel the July 2, 2020 purchase and sale agreement with the price redacted.

89.     When the Third Party Bidder's counsel replied the next day asking for the unredacted purchase and sale agreement, Chinapen's counsel responded that the transaction was cancelled and then cut off further communication.

90.     Indeed, while Singh's "winning bid" was $1,304,000, the purchase and sale agreement provided a purchase price of only $950,000, which explains why Chinapen refused to send the Third Party Bidder an unredacted copy of the agreement.

91.     On September 17, the RHSS broker contacted by the Third Party Bidder advised his RHSS colleague, defendant Torres, about the Third Party Bidder's complaint regarding the 35 Chestnut Property.

92.     Torres tipped off Remedios via WhatsApp the following day and Remedios promptly directed cancellation of the closing with defendant Chestnut Stump Group – *moments before it happened* – in an ultimately unavailing effort to avoid discovery of their fraudulent activities and the Defendants' conspiracy.

93.      Plaintiffs subsequently discovered that defendant Malilay had shared with defendant Tung Nguyen, a closing agent at defendant Sheldon May, the confidential bid history information regarding the 35 Chestnut Property back on May 17, 2020, including confidential reserve price information, bidders names and the amounts of their corresponding bids.

94.     After uncovering Defendants' conspiracy to commit fraud, Plaintiffs identified 33 different properties (collectively, the "Impacted Properties") purchased by or on behalf of the Buying Agent Defendants and/or Buyer Defendants at prices far below the amounts that should have been paid to purchase these properties.  A list of the Impacted Properties identified by Plaintiffs to date is attached hereto as **Exhibit B**.

95.     As part of the scheme, the Buying Agent Defendants and the Buyer Defendants agreed to use Sheldon May as the closing agent for the properties they purchased with the help of the Conspiring Employee Defendants.  Sheldon May served as the closing agent for the closing of every single one of the Impacted Properties.

96.     At all relevant times, Defendants Alyssa Nguyen and Tung Nguyen were acting within the scope of their employment with Sheldon May.

97.     Upon information and belief, in exchange for participating in this fraudulent scheme, the Conspiring Employee Defendants received kickbacks from the Buying Agent Defendants and the Buyer Defendants. Even factoring in these kickbacks, the scheme permitted the Buyer Defendants to purchase properties at heavily discounted prices below fair market value, enabling all participants in Defendants' criminal enterprise to benefit from the scheme.

*Remedios Confesses the Conspiracy*

98.     In late September 2020, after Plaintiffs had discovered ample evidence of Defendants' conspiracy, criminal enterprise, and fraudulent manipulation of the Hubzu platform, Plaintiffs confronted Remedios.

99.     On September 29, 2020, Remedios confessed in writing to Defendants' fraudulent scheme and criminal enterprise, as well as his role in it.

100.     Among other things, Remedios admitted to:

a.  Sharing Plaintiffs' confidential information including property pricing information;

b.  Facilitating approval at closing of Buying Defendants' requests for excessive and unjustified credits;

c.  Favoring certain "investors" (*i.e.*, defendant Chinapen and the Buyer Defendants) by: (i) offering them properties at lower prices; (ii) offering them credits at closing; (iii) allowing them extensions of time to close on deals; and (iv) allowing them to "fall" out of deals that were not heavily discounted below fair market value;

d.  Providing Defendants with property lists and reserve prices that allowed them to cherry pick properties to target through their fraudulent scheme;

e.  Making false statements to Plaintiffs' seller clients regarding pricing and property values;

    f.    Making requests to Plaintiffs' valuation team to reduce property values based on the asking price of the investors;

    g.    Reducing list prices to help the investors;

    h.    Blocking high bidders on properties to allow the investors to win auctions;

    i.    Colluding with the Closing Agent Defendants and providing them with confidential information; and

    j.    Obtaining kickbacks in connection with the scheme described herein.

101.    Remedios was subsequently terminated from his position on September 29, 2020.

102.    Based upon the robust evidence of their participation in Defendants' fraudulent scheme, Altisource terminated Malilay on September 29, 2020 and RHSS terminated Torres on October 21, 2020.

## THE FRAUDULENT TRANSACTIONS

103.    Between January and October 2020, the Defendants and their criminal enterprise manipulated the Hubzu auctions of the 33 different Impacted Properties.  With respect to each of the following 33 Impacted Properties, Defendants, acting in furtherance of their fraudulent conspiracy and criminal enterprise, facilitated acquisitions by defendants Ramgobin and Chinapen for less than the fair market value of the Impacted Properties and/or less than a bona fide third party was willing, ready and able to pay for them.  All of the individual person Defendants willingly and knowingly participated in the criminal enterprise and received valuable and illegal consideration, directly or indirectly, for their contributions.

104.    On information and belief, defendants Chinapen, Ramgobin and Singh are all related as they all reside at the same address of 8758 111th Street in Richmond Hill, New York.

105.    In furtherance Defendants' fraudulent conspiracy and criminal enterprise, at all relevant times Ramgobin and Singh acted as agents of Chinapen.

106.    As further evidence of the relationship between the Defendants, Ramgobin is listed as the DOS process agent for all of the Buyer Defendants with the exception of defendant 144 Potters Group Corp, 3537 Daniel Crescent Group Corp, Save144 Group Corp and 3722 63rd LLC and all of the Buyer Defendants have the same DOS process address with the exception of 144 Potters Group Corp, 3537 Daniel Crescent Group Corp, and Save144 Group Corp.

*912 E. 15th Street, Brooklyn, NY*

107.    Using deceit and artifice, Defendant Ramgobin purchased the property located at 912 E. 15th Street in Brooklyn, New York outside the normal process on the Hubzu platform for $210,000 less than a legitimate bidder offered during the final auction cycle for the property on the Hubzu platform.

108.    When the final auction cycle for the property started, the list price was $824,000, the starting bid price was $607,000, and the seller's confidential reserve price was $741,600.

109.    The highest bid by a bona fide third party bidder during the final auction cycle was $758,500.

110.    Because the bona fide bid of $758,500 was above the seller's confidential reserve price of $741,600, that bidder should have received a proposed PSA after the auction as an invitation to proceed with a purchase of the property for $758,500, subject to the seller's final approval.

111.    Instead, in furtherance of Defendants' fraudulent conspiracy and criminal enterprise, on March 6, 2020, Remedios, using wires across international and/or state lines, contacted Plaintiffs' asset valuation team and requested a reduction of the asset value for the 912 E. 15th Street property, misrepresenting that the bid range on the property was $520,000 - $550,000.

112.     On information and belief, Remedios contacted the asset valuation team at the direction of defendants Chinapen and Ramgobin, who had conveyed to Remedios their desire to purchase the property for $550,000.

113.     Remedios had a duty to inform the asset valuation team that there had been legitimate bids for the property above the seller's confidential reserve price during the last auction cycle, including the high bid of $758,500, but Remedios, acting in furtherance of Defendants' fraudulent conspiracy and criminal enterprise, knowingly and purposefully did not disclose that information to the asset valuation team and instead misrepresented that the bid amounts were in the range of $520,000 - $550,000(the "912 E. 15th Street Fraud No. 1").

114.     As a direct and proximate result of the 912 E. 15th Street Fraud No. 1, on March 9, 2020, Plaintiffs' asset valuation team reduced the asset value assigned to the 912 E. 15th Street property in the Hubzu platform by $159,000, from $734,000 to $575,000.

115.     Armed with the reduced asset valuation, on or about March 10, 2020 and again on March 16, 2020, Remedios contacted the seller via email using wires across international and/or state lines and requested approval to accept an offer from an "investor" (Ramgobin) to purchase the property for $550,000.

116.     In furtherance of Defendants' fraudulent conspiracy and criminal enterprise, Remedios represented to the seller that the asset value of the property had been reduced to $575,000, which made the $550,000 offer from Ramgobin appear reasonable to the seller.

117.     Although he had a duty to do so, Remedios knowingly and purposefully did not disclose to the seller that legitimate bidders had submitted bids in excess of the seller's confidential reserve price during the last auction cycle, including the high bid of $758,500 (the "912 E. 15th Street Fraud No. 2" and, collectively with the 912 E. 15th Street Fraud No. 1, the

"912 E. 15th Street Fraud").  Remedios did not disclose that information to the seller so that defendants Ramgobin and Chinapen could succeed in their fraudulent conspiracy and criminal enterprise to purchase the property for nearly $210,000 less than a legitimate buyer would have otherwise paid for the property.

118.    In reliance on the information provided by Remedios, on March 16, 2020, the seller agreed to accept Ramgobin's $550,000 offer.

119.    The seller would not have accepted Ramgobin's $550,000 offer but for the 912 E. 15th Street Fraud.

120.    On March 24, 2020, Ramgobin formed defendant 912 East Group Corp, a New York corporation, to consummate Defendants' fraudulent conspiracy by purchasing the 912 E. 15th Street property.

121.    On March 27, 2020, Ramgobin, on behalf of 912 East Group Corp, signed a PSA to acquire the 912 E. 15th Street property.

122.    The sale closed on April 29, 2020 for the final sale price of $550,000.

123.    Defendant Voro LLC (Chinapen) served as the buyer's agent in connection with the transaction, defendant Torres served as the listing agent, and defendant Sheldon May served as the closing agent.  All of them acted on behalf of Defendants' fraudulent conspiracy and criminal enterprise in their actions relating to the sale of the 912 E. 15th Street property.

124.    Defendant Chinapen or his agent paid an illegal $10,000 kickback payment to Remedios as compensation for his criminal conduct to facilitate the unlawful sale of the 912 E. 15th Street property to Ramgobin (via 912 East Group Corp), in furtherance of Defendants' fraudulent conspiracy and criminal enterprise.

125.     But for the fraudulent conduct of defendants Voro LLC, Chinapen, 912 East Group Corp, Ramgobin, Remedios, Torres, Malilay, and the Closing Agent Defendants, the 912 E. 15th Street property would have sold for at least $758,500.

126.     But for the fraudulent conduct of defendants Voro LLC, Chinapen, 912 East Group Corp, Ramgobin, Remedios, Torres, Malilay and the Closing Agent Defendants, plaintiff AOA would have received a larger buyer's premium and plaintiff RHSS would have received a larger commission based upon the difference between the price that the property should have sold for and the actual sale price that defendants Voro LLC, Chinapen, 912 East Group Corp, Ramgobin, Remedios, Torres, Malilay, and the Closing Agent Defendants procured through their concerted fraud.

### 2 Old Estate Road, Glencove, NY

127.     Using deceit and artifice, Defendant Ramgobin purchased the property located at 2 Old Estate Road in Glencove, New York outside the normal process on the Hubzu platform for approximately $100,000 less than a legitimate bidder had offered to pay.

128.     When the final auction cycle for the property started, the list price was $673,100, the starting bid price was $467,000, and the seller's confidential reserve price was $599,059.

129.     On February 26, 2020, using wires across international and/or state lines, defendant Tung Nguyen emailed Remedios a list of offers from an "investor" (Chinapen) to purchase twenty-two properties listed on the Hubzu platform, including the 2 Old Estate property (the "Multiple Property Offer").  A true and accurate copy of the Multiple Property Offer is attached as "**Exhibit C**."

130.     The Multiple Property Offer submitted by Tung Nguyen on behalf of Chinapen, in furtherance of Defendants' fraudulent conspiracy and criminal enterprise, included an offer to purchase the 2 Old Estate property for $525,000.

131.     The highest bid in the final auction cycle for the 2 Old Estate Road property was $769,000.  Although a legitimate third party bidder submitted that bid, after the auction cycle ended the bidder advised plaintiff AOA that he would only pay $675,000 for the property, slightly more than the list price.

132.     At the time the bid for $769,000 was cancelled, there was an active backup bid of $600,059.

133.     On February 26, 2020 – the same day that Remedios received the Multiple Property Offer – Remedios, using wires across international and/or state lines emailed the seller and requested approval to sell the property to Ramgobin for $525,000.

134.     In furtherance of Defendants' fraudulent conspiracy and criminal enterprise, Remedios did not disclose to the seller that the prevailing bidder had offered to purchase the property for $675,000 and did not disclose that there was an active back up bid of $600,059, despite his duty to disclose that information to the seller (the "2 Old Estate Fraud No. 1").

135.     Relying upon the 2 Old Estate Fraud No. 1, the seller agreed to sell the property to Ramgobin (acting as Chinapen's agent) for $525,000.

136.     The seller would not have agreed to sell the 2 Old Estate Road property to Ramgobin for $525,000 if Remedios had disclosed the $675,000 and/or $600,059 offers to the seller.

137.    On February 27, 2020, Ramgobin formed defendant Older2 Group Corp, a New York corporation, to consummate Defendants' fraudulent conspiracy by serving as the entity that would purchase the 2 Old Estate Road property.

138.    On March 2, 2020, Ramgobin, on behalf of Older2 Group Corp, signed a PSA to acquire the 2 Old Estate Road property for $525,000.

139.    But Chinapen and Ramgobin were not satisfied with merely buying the property for significantly less than a bona fide third party had offered, and demanded an additional seller credit of $25,000.  Accordingly, on April 16, 2020, Remedios fraudulently represented to the seller in furtherance of his conspiracy with Chinapen and Ramgobin, that the investor (defendant Ramgobin) was having difficulty with her lender and needed a seller credit of an additional $25,000 to secure financing and close the transaction (the "2 Old Estate Fraud No. 2" and, collectively with the 2 Old Estate Fraud No. 1, the "2 Old Estate Fraud").

140.    In reliance upon the 2 Old Estate Fraud No. 2, the seller agreed to provide a $25,000 seller credit, reducing the effective final purchase price to $500,000.

141.    Remedios, Chinapen and Ramgobin knew the 2 Old Estate Fraud No. 2 was false at the time it was made because they knew that the $525,000 offer from Ramgobin and Chinapen was a cash offer and that they neither needed nor intended to seek financing to facilitate the purchase.

142.    The sale closed on April 29, 2020 at an effective final sale price of $500,000.

143.    Defendant Voro LLC served as the buyer's agent in connection with the transaction, defendant Torres served as the listing agent, and Sheldon May served as the closing agent.  All of them acted on behalf of Defendants' fraudulent conspiracy and criminal enterprise in their actions relating to the sale of the 2 Old Estate Road property.

144.    Chinapen or his agent paid an illegal $5,000 kickback payment to Remedios as compensation for his criminal conduct to facilitate the unlawful sale of the 2 Old Estate Road property to Ramgobin (via Older2 Group Corp), in furtherance of Defendants' fraudulent conspiracy and criminal enterprise.

145.    But for the fraudulent conduct of defendants Voro LLC, Chinapen, Older2 Group Corp, Ramgobin, Remedios, Torres, Malilay, and the Closing Agent Defendants, the 2 Old Estate Road property would have sold for at least $600,059.

146.    But for the fraudulent conduct of defendants Voro LLC, Chinapen, Older2 Group Corp, Ramgobin, Remedios, Torres, Malilay, and the Closing Agent Defendants, plaintiff AOA would have received a larger buyer's premium and plaintiff RHSS would have received a larger commission based upon the difference between the price that the property should have sold for and the actual sale price that defendants Voro LLC, Chinapen, Older2 Group Corp, Ramgobin, Remedios, Torres, Malilay, and the Closing Agent Defendants procured through their concerted fraud.

### *14 Potters Lane, New Rochelle, NY*

147.    Using deceit and artifice, Defendant Ramgobin purchased the property located at 14 Potters Lane in New Rochelle, New York outside the normal process on the Hubzu platform for $161,000 less than a legitimate bidder had offered to pay.

148.    When the final auction cycle for the property started, the list price was $1,005,400, the starting bid price was $638,000, and the seller's confidential reserve price was $881,736.

149.    On February 12, 2020, the final auction cycle ended with a high bid of $701,000 from a third party, which did not meet the seller's confidential reserve price.

150.    In furtherance of Defendants' fraudulent conspiracy and criminal enterprise, Remedios, using wires across international and/or state lines, contacted Plaintiffs' asset valuation team and requested a reduction of the asset value for the 14 Potters Lane property.

151.    On information and belief, Remedios contacted the asset valuation team at the direction of defendants Chinapen and Ramgobin, who had conveyed to Remedios their desire to purchase the property for $540,000.

152.    Remedios had a duty to inform the asset valuation team that there had been bids as high as $701,000 during the last auction cycle, but Remedios, acting in furtherance of Defendants' fraudulent conspiracy and criminal enterprise, knowingly and purposefully did not disclose that information to the asset valuation team (the "14 Potters Lane Fraud No. 1").

153.    As a direct and proximate result of the 14 Potters Lane Fraud No. 1, Plaintiffs' asset valuation team reduced the asset value assigned to the 14 Potters Lane property in the Hubzu platform from $1,000,000 to $521,000.

154.    Armed with the reduced asset valuation, on February 14, 2020, Remedios contacted the seller's agent, Marisha Spence, via email using wires across international and/or state lines and requested approval to accept an offer from an "investor" (Ramgobin) to purchase the property for $540,000.

155.    In furtherance of Defendants' fraudulent conspiracy and criminal enterprise, Remedios represented to the seller that the asset value of the property had been reduced to $521,000, which made the $540,000 offer from Ramgobin appear reasonable to the seller.

156.    Although he had a duty to do so, Remedios knowingly and purposefully did not disclose to the seller that a legitimate bidder had submitted a bid of $701,000 during the last auction cycle (the "14 Potters Lane Fraud No. 2" and, collectively with the 14 Potters Lane

28

Fraud No. 1, the "14 Potters Lane Fraud").  Remedios did not disclose that information to the seller, despite having a duty to do so, for the specific purpose of aiding and abetting defendants Ramgobin and Chinapen in their fraudulent conspiracy and criminal enterprise to purchase the property for $161,000 less than a legitimate buyer would have otherwise paid for the property.

157.    In reliance on the information provided by Remedios, on February 17, 2020, the seller agreed to accept Ramgobin's $540,000 offer.

158.    The seller would not have accepted Ramgobin's $540,000 offer but for the 14 Potters Lane Fraud.

159.    On February 19, 2020, Ramgobin formed defendant 14 Potters Group Corp, a New York corporation, to consummate Defendants' fraudulent conspiracy by serving as the entity that would purchase the 14 Potters Lane property.

160.    On February 19, 2020, Ramgobin, on behalf of 14 Potters Group Corp, signed a PSA to acquire the 14 Potters Lane property.

161.    The sale closed on March 17, 2020 for the final sale price of $540,000.

162.    Chinapen served as the buyer's agent in connection with the transaction, and Sheldon May served as the closing agent.  All of them acted on behalf of Defendants' fraudulent conspiracy and criminal enterprise in their actions relating to the sale of the 14 Potters Lane property.

163.    Chinapen or his agent paid an illegal $15,000 kickback payment to Remedios as compensation for his criminal conduct to facilitate the unlawful sale of the 14 Potters Lane property to Ramgobin (via 14 Potters Group Corp), in furtherance of Defendants' fraudulent conspiracy and criminal enterprise.

164.    But for the fraudulent conduct of defendants Chinapen, 14 Potters Group Corp, Ramgobin, Remedios, Malilay, and the Closing Agent Defendants, the 14 Potters Lane property would have sold for at least $701,000.

165.    But for the fraudulent conduct of defendants Chinapen, 14 Potters Group Corp, Ramgobin, Remedios, Malilay, and the Closing Agent Defendants, plaintiff AOA would have received a larger buyer's premium and plaintiff RHSS would have received a larger commission based upon the difference between the price that the property should have sold for and the actual sale price that defendants Chinapen, 14 Potters Group Corp, Ramgobin, Remedios, Malilay, and the Closing Agent Defendants procured through their concerted fraud.

### *144 Stone Avenue, Yonkers, NY*

166.    Using deceit and artifice, Defendant Ramgobin purchased the property located at 144 Stone Avenue in Yonkers, New York outside the normal process on the Hubzu platform for $117,000 less than a legitimate bidder had offered to pay.

167.    When the final auction cycle for the property started, the list price was $541,200, the starting bid price was $300,000, and the seller's confidential reserve price was $492,492.

168.    The highest bid in the final auction cycle for the 144 Stone Avenue property was $417,000, which was below the seller's reserve price.

169.    In furtherance of Defendants' fraudulent conspiracy and criminal enterprise, Remedios, using wires across international and/or state lines, contacted Plaintiffs' asset valuation team on February 21, 2020 and requested a reduction of the asset value for the 144 Stone Avenue property.

170.    On information and belief, Remedios contacted the asset valuation team at the direction of defendants Chinapen and Ramgobin, who had conveyed to Remedios their desire to purchase the property for $300,000.

171.    Remedios had a duty to inform the asset valuation team that there had been a legitimate bid of $417,000 for the property, but Remedios, acting in furtherance of Defendants' fraudulent conspiracy and criminal enterprise, knowingly and purposefully did not disclose that information to the asset valuation team (the "144 Stone Fraud No. 1").

172.    As a direct and proximate result of the 144 Stone Fraud No. 1, Plaintiffs' asset valuation team reduced the asset value assigned to the 144 Stone Avenue property in the Hubzu platform by $192,000, from $582,000 to $390,000.

173.    On February 26, 2020, using wires across international and/or state lines, and in furtherance of Defendants' fraudulent conspiracy and criminal enterprise, defendant Tung Nguyen emailed Remedios the Multiple Property Offer, which included an offer to purchase the 144 Stone Avenue property for $300,000.

174.    That same day, Remedios, using wires across international and/or state lines emailed the seller and requested approval to sell the property to Ramgobin for $300,000.

175.    In furtherance of Defendants' fraudulent conspiracy and criminal enterprise, Remedios represented to the seller that the asset value of the property had been reduced to $390,000, which made the $300,000 offer from Ramgobin appear less unreasonable to the seller.

176.    Although he had a duty to do so, Remedios knowingly and purposefully did not disclose to the seller that a legitimate bidder had submitted a bid for $417,000 (the "144 Stone Fraud No. 2" and, collectively with the 144 Stone Fraud No. 1, the "144 Stone Fraud"). Remedios did not disclose that information to the seller so that defendants Ramgobin and

Chinapen could succeed in their fraudulent conspiracy and criminal enterprise to purchase the property for $117,000 less than a legitimate buyer would have otherwise paid for the property.

177.    In reliance on the information provided by Remedios, the seller agreed to accept Ramgobin's $300,000 offer.

178.    The seller would not have accepted Ramgobin's $300,000 offer but for the 144 Stone Fraud.

179.    By email dated February 27, 2020, Remedios advised defendant Tung Nguyen that the seller had accepted the investor's $300,000 offer.

180.    On February 27, 2020, defendant Save144 Group Corp, a New York corporation was formed for the purpose of purchasing the 144 Stone Avenue property.

181.    Once the seller accepted the $300,000 offer, Remedios opened up the final auction in the Hubzu platform on the 144 Stone Avenue property, and Ramgobin, using wires across international and/or state lines in furtherance of the Defendants' fraudulent conspiracy, entered a single bid of $300,000 that Remedios immediately accepted.

182.    On March 3, 2020, defendant Save144 Group Corp signed a PSA to acquire the property.

183.    The sale closed on March 31, 2020 at a final sale price of $300,000.

184.    Defendant Voro LLC (Chinapen) served as the buyer's agent in connection with the transaction, and Sheldon May served as the closing agent.  All of them acted on behalf of Defendants' fraudulent conspiracy and criminal enterprise in their actions relating to the sale of the 144 Stone Avenue property.

185.    Chinapen or his agent paid an illegal $2,000 kickback payment to Remedios as compensation for his criminal conduct to facilitate the unlawful sale of the 144 Stone Avenue

property to Ramgobin (via Save144 Group Corp), in furtherance of Defendants' fraudulent conspiracy and criminal enterprise

186.    But for the fraudulent conduct of defendants Voro LLC, Chinapen, Save144 Group Corp, Ramgobin, Remedios, Malilay, and the Closing Agent Defendants, the 144 Stone Avenue property would have sold for at least $417,000.

187.    But for the fraudulent conduct of defendants Voro LLC, Chinapen, Save144 Group Corp, Ramgobin, Remedios, Malilay, and the Closing Agent Defendants, plaintiff AOA would have received a larger buyer's premium and plaintiff RHSS would have received a larger commission based upon the difference between the price that the property should have sold for and the actual sale price that defendants Voro LLC, Chinapen, Save144 Group Corp, Ramgobin, Remedios, Malilay, and the Closing Agent Defendants procured through their concerted fraud.

### *2068 Arthur Avenue, Bronx, NY*

188.    Using deceit and artifice, Defendant Ramgobin purchased the property located at 2068 Arthur Avenue in Bronx, New York for over $125,000 less than a legitimate bidder had offered to pay.

189.    When the final auction cycle for that property started, the list price was $254,400, the starting bid price was $174,000, and the seller's confidential reserve price was $228,960.

190.    The highest bid by a bona fide third party bidder in the final auction cycle was $318,960, which was above the seller's reserve price.

191.    On March 18, 2020, defendant Allysa Nguyen, in furtherance of Defendants' fraudulent conspiracy and criminal enterprise, using wires across international and/or state lines, emailed Remedios stating that she had an "investor" interested in four (4) properties, including the 2068 Arthur Avenue property and offered $190,000 for the property.

192.    Then, using wires across state lines, defendant Ramgobin submitted a bid of $231,960 during that final auction cycle.  Because her bid was above – *albeit barely* – the seller's confidential reserve price, Remedios could accept her bid without obtaining independent approval from the seller.

193.    In furtherance of Defendants' fraudulent conspiracy and criminal enterprise, Remedios manipulated the Hubzu platform by cancelling the high bid of $318,960 and accepting Ramgobin's bid of $231,960.

194.    Although he had a duty to do so, Remedios knowingly and purposefully did not disclose to the seller that a legitimate bidder had submitted a bid for $318,960 (the "2068 Arthur Fraud No. 1").

195.    Remedios did not disclose that information to the seller, despite having a duty to do so, for the specific purpose of aiding and abetting defendants Ramgobin and Chinapen in their fraudulent conspiracy and criminal enterprise to purchase the property for approximately $57,000 less than a legitimate buyer would have otherwise paid for the property, in furtherance of Defendants' fraudulent conspiracy and criminal enterprise.

196.    On March 17, 2020, Ramgobin formed defendant 2068 Arthur Group Corp, a New York corporation, to consummate Defendants' fraudulent conspiracy by serving as the entity that would purchase the 2068 Arthur Avenue property.

197.    Ramgobin signed a PSA to purchase the 2068 Arthur Avenue property in her individual capacity on March 20, 2020.

198.    The seller signed the PSA on March 23, 2020, thereby selling the 2068 Arthur Avenue property to Ramgobin for $231,960.

199.    The seller would not have signed the PSA but for the 2068 Arthur Fraud No. 1.

200.    On March 26, 2020, Ramgobin and the seller signed an amendment to the PSA to permit Ramgobin to take title to the property in the name of defendant 2068 Arthur Group Corp.

201.    But Chinapen and Ramgobin were not satisfied with merely buying the property for significantly less than a bona fide third party had offered and demanded a $40,000 seller credit.   Accordingly, on March 25, 2020, Remedios, acting on behalf of Chinapen and in furtherance of Defendants' fraudulent conspiracy and criminal enterprise, manually approved a $40,000 seller credit in favor of 2068 Arthur Group Corp that Remedios falsely represented was for the purpose of compensating the buyer for the cost of purported necessary repairs to the property (the "2068 Arthur Fraud  No. 2" and, collectively with the 2068 Arthur Fraud No. 1, the "2068 Arthur Fraud").

202.    Remedios, Chinapen and Ramgobin knew the 2068 Arthur Fraud No. 2 was false at the time it was made because they knew that the property did not need $40,000 in repairs, nor was there any other legitimate basis for the $40,000 seller credit that Chinapen and Ramgobin demanded.

203.    The sale closed on May 13, 2020 at an effective final sale price of $191,960.

204.    Voro LLC (Chinapen) served as the buyer's agent in connection with the transaction, and Sheldon May served as the closing agent.   All of them acted on behalf of Defendants' fraudulent conspiracy and criminal enterprise in their actions relating to the sale of the 2068 Arthur Avenue property.

205.    Chinapen or his agent paid an illegal $5,000 kickback payment to Remedios as compensation for his criminal conduct to facilitate the unlawful sale of the 2068 Arthur Avenue property to Ramgobin (via 2068 Arthur Group Corp), in furtherance of Defendants' fraudulent conspiracy and criminal enterprise.

206.    But for the fraudulent conduct of defendants Voro LLC, Chinapen, 2068 Arthur Group Corp, Ramgobin, Remedios, Malilay, and the Closing Agent Defendants, the 2068 Arthur Avenue property would have sold for at least $318,960.

207.    But for the fraudulent conduct of defendants Voro LLC, Chinapen, 2068 Arthur Group Corp, Ramgobin, Remedios, Malilay, and the Closing Agent Defendants, plaintiff AOA would have received a larger buyer's premium and plaintiff RHSS would have received a larger commission based upon the difference between the price that the property should have sold for and the actual sale price that defendants Voro LLC, Chinapen, 2068 Arthur Group Corp, Ramgobin, Remedios, Malilay, and the Closing Agent Defendants procured through their concerted fraud.

### *1880 Longfellow Avenue, East Meadow, NY*

208.    Using deceit and artifice, Defendant Ramgobin purchased the property located at 1880 Longfellow Avenue in East Meadow, New York outside the normal process on the Hubzu platform for $93,500 less than a legitimate bidder had offered to pay.

209.    When the final auction cycle for the property started, the list price was $413,400, the starting bid price was $279,000, and the seller's confidential reserve price was $372,060.

210.    The highest bid by a bona fide third party bidder in the final auction cycle was $443,500, which was above the seller's confidential reserve price.

211.    Remedios manually cancelled the listing in the Hubzu system on the pretext that the bidder had "fallen out" of the system by failing to respond to the invitation to enter into a PSA with the seller.  At the time Remedios manually cancelled the listing, he knew the bid was legitimate or had no reason to believe that the bid was illegitimate.

212. On February 26, 2020, using wires across international and/or state lines, and in furtherance of Defendants' fraudulent conspiracy and criminal enterprise, defendant Tung Nguyen emailed Remedios the Multiple Property Offer, which included an offer to purchase the 1880 Longfellow Avenue property for $350,000.

213. That same day, Remedios, using wires across international and/or state lines, emailed the seller and requested approval to sell the property to Ramgobin for $350,000.

214. In furtherance of Defendants' fraudulent conspiracy and criminal enterprise, Remedios did not disclose to the seller that the legitimate prevailing bidder had offered to purchase the property for $443,500 (the "1880 Longfellow Fraud"). Although he had a duty to disclose that information to the seller, Remedios intentionally did not disclose that information for the specific purpose of aiding and abetting Chinapen and Ramgobin in their fraudulent conspiracy and criminal enterprise.

215. Relying upon the 1880 Longfellow Fraud, the seller agreed to sell the property to Ramgobin (acting as Chinapen's agent) for $350,000.

216. The seller would not have agreed to sell the 1800 Longfellow Avenue property to Ramgobin for $350,000 if Remedios had disclosed the $443,500 offer to the seller.

217. On February 27, 2020, Ramgobin formed defendant LFA1880 Group Corp, a New York corporation, to consummate Defendants' fraudulent conspiracy by serving as the entity that would purchase the 1880 Longfellow Avenue property.

218. Once the seller accepted the $350,000 offer, Remedios, using wires across international and/or state lines, commenced a one day auction on the Hubzu platform for the 1880 Longfellow Avenue property, in collusion with Chinapen and Ramgobin, for the purpose of

allowing Ramgobin to submit a bid for $350,000 so that the transaction would be automatically documented through the Hubzu platform as if it were a legitimate sale to a prevailing bidder.

219.    Ramgobin, using wires across international and/or state lines in furtherance of the Defendants' fraudulent conspiracy, submitted a single bid of $350,000 for the 1880 Longfellow Avenue property, which Remedios promptly accepted by manually manipulating the Hubzu system.

220.    On March 2, 2020, as a result of the 1880 Longfellow Fraud, Ramgobin, on behalf of LFA1880 Group Corp, signed a PSA to acquire the property.

221.    The transaction closed on March 31, 2020 at a final sale price of $350,000.

222.    Defendant Voro LLC (Chinapen) served as the buyer's agent in connection with the transaction, Sheldon May served as the closing agent and defendant Torres served as the listing agent.  All of them acted on behalf of Defendants' fraudulent conspiracy and criminal enterprise in their actions relating to the sale of the 1880 Longfellow Avenue property.

223.    Chinapen or his agent paid an illegal $3,000 kickback payment to Remedios as compensation for his criminal conduct to facilitate the unlawful sale of the 1880 Longfellow Avenue property to Ramgobin (via LFA1880 Group Corp), in furtherance of Defendants' fraudulent conspiracy and criminal enterprise.

224.    But for the fraudulent conduct of defendants Voro LLC, Chinapen, LFA1880 Group Corp, Ramgobin, Remedios, Torres, Malilay, and the Closing Agent Defendants, the 1880 Longfellow Avenue property would have sold for at least $443,500.

225.    But for the fraudulent conduct of defendants Voro LLC, Chinapen, LFA1880 Group Corp, Ramgobin, Remedios, Torres, Malilay, and the Closing Agent Defendants, plaintiff AOA would have received a larger buyer's premium and plaintiff RHSS would have received a

larger commission based upon the difference between the price that the property should have sold for and the actual sale price that defendants Voro LLC, Chinapen, LFA1880 Group Corp, Ramgobin, Remedios, Torres, Malilay, and the Closing Agent Defendants procured through their concerted fraud.

*38 Horn Lane, Levittown, NY*

226.    Using deceit and artifice, Defendant Ramgobin purchased the property located at 38 Horn Lane in Levittown, New York outside the normal process on the Hubzu platform for approximately $63,000 less than she should have paid.

227.    When the final auction cycle for the property started, the list price was $381,600, the starting bid price was $275,000, and the seller's confidential reserve price was $339,624.

228.    The last auction cycle ended on March 23, 2020.  Multiple bidders submitted bids above the reserve price.

229.    Five bidders that had submitted bids above the reserve price did not respond to communications through the Hubzu platform inviting them to enter into a PSA with the seller.

230.    In furtherance of Defendants' fraudulent conspiracy and criminal enterprise, and at the direction of Chinapen and Ramgobin, Remedios did not place the property back into another auction cycle.

231.    In furtherance of Defendants' fraudulent conspiracy and criminal enterprise, Remedios did not contact a legitimate bidder who had submitted a backup bid above the seller's reserve price.

232.    Instead, on May 8, 2020, defendant Tung Nguyen emailed Remedios, in furtherance of Defendants' fraudulent conspiracy and criminal enterprise, using wires across international and/or state lines, and advised Remedios that she had an "investor" (Ramgobin)

who wanted to buy the 38 Horn Lane property for $280,000, all cash. In order to make the transaction look legitimate, Remedios responded that another buyer signed a contract but if they "happen to fallout we will proceed with the contract at your offer."

233. A week later, on May 15, 2020, Ramgobin formed defendant Horn Lane Group Corp, a New York corporation, to consummate Defendants' fraudulent conspiracy by serving as the entity that would purchase the 38 Horn Lane property.

234. In furtherance of Defendants' fraudulent conspiracy and criminal enterprise, Remedios knowingly and intentionally ignored the prior bona fide bid above the seller's confidential reserve price.

235. Although he had a duty to do so, Remedios knowingly and purposefully did not disclose to the seller that a legitimate bidder had submitted a bid above the confidential reserve price (the "38 Horn Fraud"). Remedios did not disclose that information to the seller for the specific purpose of aiding and abetting Ramgobin and Chinapen in their fraudulent conspiracy and criminal enterprise to purchase the property for significantly less than a legitimate buyer would have otherwise paid for it.

236. Relying upon the 38 Horn Fraud, on May 15, 2020, the seller agreed to sell the property to Ramgobin (acting as Chinapen's agent) for $280,000.

237. On May 19, 2020, Chinapen, Ramgobin and Remedios caused the execution of a PSA between the seller and Horn Lane Group Corp pursuant to which it would purchase the 38 Horn Lane property for $280,000.

238. The seller would not have approved the PSA with Horn Lane Group Corp but for the 38 Horn Fraud.

239. The sale closed on June 12, 2020 at a final sale price of $280,000.

240.    Voro LLC (Chinapen) served as the buyer's agent in connection with the transaction and Sheldon May served as the closing agent.  All of them acted on behalf of Defendants' fraudulent conspiracy and criminal enterprise in their actions relating to the sale of the 38 Horn Lane property.

241.    Chinapen or his agent paid an illegal $5,000 kickback payment to Remedios as compensation for his criminal conduct to facilitate the unlawful sale of the 38 Horn Lane property to Ramgobin (via Horn Lane Group Corp), in furtherance of Defendants' fraudulent conspiracy and criminal enterprise.

242.    But for the fraudulent conduct of defendants Voro LLC, Chinapen, Horn Lane Group Corp, Ramgobin, Remedios, Malilay, and the Closing Agent Defendants, the 38 Horn Lane property would have sold for at least $343,020.

243.    But for the fraudulent conduct of defendants Voro LLC, Chinapen, Horn Lane Group Corp, Ramgobin, Remedios, Malilay, and the Closing Agent Defendants, plaintiff AOA would have received a larger buyer's premium and plaintiff RHSS would have received a larger commission based upon the difference between the price that the property should have sold for and the actual sale price that defendants Voro LLC, Chinapen, Horn Lane Group Corp, Ramgobin, Remedios, Malilay, and the Closing Agent Defendants procured through their concerted fraud.

### *37 Canterbury Drive, Wading River, NY*

244.    Using deceit and artifice, Defendant Ramgobin purchased the property located at 37 Canterbury Drive, in Wading River, New York for $30,500 less than a legitimate bidder had offered to pay.

245.    When the final auction cycle for the property started, the list price was $493,500, the starting bid price was $368,000, and the seller's confidential reserve price was $449,085.

246.    The highest bid during the final auction cycle was a bid from a bona fide bidder for $390,500, which was below the seller's confidential reserve price.

247.    In furtherance of Defendants' fraudulent conspiracy and criminal enterprise, Remedios did not place the property back into another auction cycle after it failed garner any bids above the seller's confidential reserve price.

248.    On June 4, 2020, defendant Allysa Nguyen emailed Remedios, in furtherance of Defendants' fraudulent conspiracy and criminal enterprise, using wires across international and/or state lines, and advised Remedios that she had an "investor" (Ramgobin) who wanted to buy the 37 Canterbury Drive property for $360,000, all cash.   One hour later, Remedios responded via email and told Nguyen the offer was approved.

249.    Remedios, using wires across international and/or state lines, manually accepted the $360,000 offer from Canterbury Drive Group Corp that had been submitted outside the Hubzu system.

250.    On the same date, Ramgobin formed defendant Canterbury Drive Group Corp, a New York corporation, to consummate Defendants' fraudulent conspiracy by serving as the entity that would purchase the 37 Canterbury Drive property.

251.    Although he had a duty to do so, Remedios knowingly and purposefully did not disclose to the seller that a bidder had submitted a legitimate offer to purchase the property for $390,500 (the "37 Canterbury Drive Fraud").  Although he had a duty to do so, Remedios did not disclose that information to the seller for the specific purpose of aiding and abetting defendants Ramgobin and Chinapen  in their fraudulent conspiracy and criminal enterprise to purchase the

property for over $30,000 less than a legitimate buyer would have otherwise paid for the property.

252.    The seller would not have accepted Ramgobin's $360,000 offer but for the 37 Canterbury Drive Fraud.

253.    On June 18, 2020, Ramgobin, on behalf of Canterbury Drive Group Corp, signed a PSA to acquire the 37 Canterbury Drive property

254.    The sale closed on August 26, 2020 at a final sale price of $360,000.

255.    But for the 37 Canterbury Drive Fraud, the seller would not have sold the property to Canterbury Drive Group Corp.

256.    Voro LLC (Chinapen) served as the buyer's agent in connection with the transaction, and Sheldon May served as the closing agent.  All of them acted on behalf of Defendants' fraudulent conspiracy and criminal enterprise in their actions relating to the sale of the 37 Canterbury Drive property.

257.    Chinapen or his agent paid an illegal $3,000 kickback payment to Remedios as compensation for his criminal conduct to facilitate the unlawful sale of the 37 Canterbury Drive property to Ramgobin (via Canterbury Drive Group Corp), in furtherance of Defendants' fraudulent conspiracy and criminal enterprise.

258.    But for the fraudulent conduct of defendants Voro LLC, Chinapen, Canterbury Drive Group Corp, Ramgobin, Remedios, Malilay, and the Closing Agent Defendants, the 37 Canterbury Drive property would have sold for at least $390,500.

259.    But for the fraudulent conduct of defendants Voro LLC, Chinapen, Canterbury Drive Group Corp, Ramgobin, Remedios, Malilay, and the Closing Agent Defendants, plaintiff AOA would have received a larger buyer's premium and plaintiff RHSS would have received a

larger commission based upon the difference between the price that the property should have sold for and the actual sale price that defendants Voro LLC, Chinapen, Canterbury Drive Group Corp, Ramgobin, Remedios, Malilay, and the Closing Agent Defendants procured through their concerted fraud.

*865 Edward Street, Baldwin, NY*

260.    Using deceit and artifice, Defendant Ramgobin purchased the property located at 865 Edward Street in Baldwin, New York for $90,000 less than she should have paid.

261.    When the final auction cycle for the property started, the list price was $333,500, the starting bid price was $228,000, and the seller's confidential reserve price was $300,150.

262.    In furtherance of Defendants' fraudulent conspiracy and criminal enterprise, and using wires across state lines, defendant Malilay sent an email to defendant Tung Nguyen on January 24, 2020 with a screen shot of Malilay's computer showing the auction listing for the 865 Edward Street property.  Importantly, the property description shown in the screen shot Malilay sent stated that the property was "REO Occupied" and that bidders would not be permitted to view the property or conduct any inspections.

263.    Ramgobin submitted the lone bid in the amount of $358,000, which was above both the list price and the seller's confidential reserve price.

264.    As the prevailing bidder, Ramgobin executed a PSA on January 30, 2020 to purchase the property for $358,000.

265.    Then, on February 12, 2020, Remedios, acting on behalf of Chinapen and Ramgobin and in furtherance of Defendants' fraudulent conspiracy and criminal enterprise, manually approved a $90,000 seller credit in favor of Ramgobin that Remedios and Allysa

Nguyen falsely represented was for the purpose of compensating her for the cost of purported necessary repairs to the property (the "865 Edward Fraud").

266.    Remedios, Chinapen, Ramgobin and Allysa Nguyen knew the 865 Edward Fraud was false at the time it was made because they knew that the property did not need $90,000 in repairs, nor was there any other legitimate basis for the $90,000 seller credit. Moreover, because the property was occupied by a tenant at the time of the transaction, neither Ramgobin nor any of the other Defendants were permitted to access, view or inspect the property, which would have been necessary to determine that it required repairs that would cost $90,000.

267.    The sale closed on February 26, 2020 at an effective final sale price of $268,000, which included a reduction of $90,000 for the fraudulent and fabricated seller credit Ramgobin procured. At the direction of Chinapen and Ramgobin, the deed for the property was issued in the name of defendant AMC66P Group Corp.

268.    Chinapen served as Ramgobin's agent in connection with the transaction, Torres served as the listing agent, and Sheldon May served as the closing agent. All of them acted on behalf of Defendants' fraudulent conspiracy and criminal enterprise in their actions relating to the sale of the 865 Edward Street property.

269.    But for the fraudulent conduct of defendants Chinapen, Ramgobin, Remedios, Torres, Malilay, and the Closing Agent Defendants, the 865 Edward Street property would have sold for $352,000.

### *3537 Daniel Crescent, Baldwin, NY*

270.    Using artifice and deceit, defendant Rahki Singh, acting as Chinapen's agent, purchased the property located at 3537 Daniel Crescent in Glencove, New York outside the

normal process on the Hubzu platform for approximately $126,000 less than he should have paid for the property.

271.    When the final auction cycle for the property started, the list price was $540,600, the starting bid price was $375,000 and the seller's confidential reserve price was $486,540.

272.    The highest bid from a legitimate third party bidder in the final auction cycle was $596,000, which was above the seller's reserve price.

273.    Following the conclusion of the auction cycle, defendant Torres, who was serving as the listing agent for the property, falsely represented to Remedios that the prevailing bidder was a sham bidder who would not complete the transaction.   Torres made this false representation for the purpose of providing Remedios with a pretext to cancel the prevailing bid and then manually manipulate the Hubzu platform to sell the property for a much lower price to Chinapen and/or his agents who were knowingly participating in the fraudulent conspiracy and criminal enterprise.

274.    On May 26, 2020, Remedios requested an Altisource Senior Specialist to cancel the prevailing bid of $596,000 on the pretext, provided by Torres, that the prevailing bidder was a sham bidder.  At the time Remedios requested that the $596,000 offer be cancelled, he knew the bid was legitimate or had no reason to believe that the bid was illegitimate or that the bidder was a sham bidder.

275.    Remedios, acting at the direction of Ramgobin and Chinapen and in furtherance of their fraudulent conspiracy and criminal enterprise, using wires across international and/or state lines, emailed the seller to request approval to sell the property to an "investor" for $400,000.

276.    On May 26, 2020, defendant Allysa Nguyen emailed Remedios, at the direction of Ramgobin and Chinapen, in furtherance of Defendants' fraudulent conspiracy and criminal enterprise, using wires across international and/or state lines, and advised Remedios that she had an "investor" (Ramgobin) interested in purchasing the 3537 Crescent property for $400,000.  Not even an hour later, Remedios responded that the offer was approved.

277.    Although he had a duty to do so, Remedios knowingly and purposefully did not disclose to the seller that there had been a bid for $596,000, which was above the seller's confidential reserve price, nor did Remedios disclose that he had cancelled that bid based upon the false representation by Torres (the "Daniel Crescent Fraud No. 1").  Remedios did not disclose that information for the specific purpose of aiding and abetting Ramgobin and Chinapen in their criminal enterprise so that they could purchase the property for significantly less than a legitimate buyer would have otherwise paid.

278.    In reliance on the information provided by Remedios, on May 26, 2020, the seller agreed to accept the $400,000 offer made by Singh on behalf of Chinapen.

279.    The seller would not have accepted Singh's $400,000 offer but for the Daniel Crescent Fraud No. 1.

280.    On July 21, 2020, Singh, acting as Chinapen's agent, formed defendant 3537 Daniel Crescent Group Corp, a New York corporation, to consummate Defendants' fraudulent conspiracy by serving as the entity that would purchase the 3537 Daniel Crescent property.

281.    On July 23, 2020, defendant Singh signed a PSA to acquire the property on behalf of 3537 Daniel Crescent Group Corp.

282.    Following execution of the PSA, Remedios, acting on behalf of Chinapen and in furtherance of Defendants' fraudulent conspiracy and criminal enterprise, contacted the seller by

email, using wires across international and/or state lines, to request approval of a $50,000 seller credit that Remedios falsely represented was warranted to compensate the buyer for the cost of purported necessary repairs to the property (the "Daniel Crescent Fraud No. 2" and, collectively with the Daniel Crescent Fraud No. 1, the "Daniel Crescent Fraud").

283.     Remedios, Chinapen and Singh knew the Daniel Crescent Fraud No. 2 was false at the time it was made because they knew that the property did not need $50,000 in repairs, nor was there any other legitimate basis for the $50,000 seller credit Remedios requested at the direction of Chinapen and Singh and/or with their knowledge and consent.

284.     The seller denied the request for a $50,000 seller credit for repairs.  However, in reliance upon the Daniel Crescent Fraud No. 2, the seller agreed to provide a $20,000 seller credit for repairs.

285.     The sale closed on July 31, 2020 at an effective final sale price of $380,000 after application of the $20,000 seller credit.

286.     Voro LLC (Chinapen) served as the buyer's agent in connection with the transaction, Torres served as the listing agent, and Sheldon May served as the closing agent.  All of them acted on behalf of Defendants' fraudulent conspiracy and criminal enterprise in their actions relating to the sale of the 3537 Daniel Crescent property.

287.     Chinapen or his agent paid an illegal $20,000 kickback payment to Remedios as compensation for his criminal conduct to facilitate the unlawful sale of the 3537 Daniel Crescent property to Chinapen (via his agent Singh and 3537 Daniel Crescent Group Corp), in furtherance of Defendants' fraudulent conspiracy and criminal enterprise.

288.    But for the fraudulent conduct of defendants Voro LLC, Chinapen, 3537 Daniel Crescent Group Corp, Singh, Remedios, Torres, Malilay, and the Closing Agent Defendants, the 3537 Daniel Crescent property would have sold for at least $506,002.

289.    But for the fraudulent conduct of defendants Voro LLC, Chinapen, 3537 Daniel Crescent Group Corp, Singh, Remedios, Torres, Malilay, and the Closing Agent Defendants, plaintiff AOA would have received a larger buyer's premium and plaintiff RHSS would have received a larger commission based upon the difference between the price that the property should have sold for and the actual sale price that defendants Voro LLC, Chinapen, 3537 Daniel Crescent Group Corp, Singh, Remedios, Torres, Malilay, and the Closing Agent Defendants procured through their concerted fraud.

*1138 Ossipee Road, West Hempstead, NY*

290.    Using deceit and artifice, Ramgobin purchased the property located at 1138 Ossipee Road in Hempstead, New York outside the normal process on the Hubzu platform for $80,000 less than she should have paid.

291.    When the final auction cycle for the property started, the list price was $487,600, the starting bid price was $334,000, and the seller's confidential reserve price was $427,625.

292.    Although there were not any active bids submitted in Hubzu, on February 26, 2020, using wires across international and/or state lines, and in furtherance of Defendants' fraudulent conspiracy and criminal enterprise, defendant Tung Nguyen emailed Remedios the Multiple Property Offer, which included an offer to purchase the 1138 Ossipee Road property for $350,000.

293.     That same day, Remedios, using wires across international and/or state lines, and acting on behalf of Chinapen and Ramgobin and at their direction, emailed the seller and requested approval to sell the property to Ramgobin for $350,000.

294.     On February 27, 2020, Ramgobin formed defendant OSSI1138 Group Corp, a New York corporation, to consummate Defendants' fraudulent conspiracy by serving as the entity that would purchase the 1138 Ossipee Road property.

295.     On or around March 2, 2020, Ramgobin, on behalf of OSSI1138 Group Corp, signed a PSA to acquire the property for $350,000.

296.     After execution of the PSA, Remedios, at the directive of Chinapen and Ramgobin, requested approval from the seller to issue a $50,000 seller credit.  Initially, the seller rejected the request because the $350,000 contract price was already more than $125,000 below the current MLS list price for the property and there was no support for the requested $50,000 seller credit.

297.     Despite the fact that the seller had rejected the request for a $50,000 seller credit, Remedios, acting on behalf of Defendants' fraudulent enterprise and criminal conspiracy, unilaterally approved a $30,000 seller credit.  A short time later, Remedios, again acting on behalf of Defendants' fraudulent enterprise and criminal conspiracy, unilaterally approved an additional $50,000 seller credit "for Covid" (the "1138 Ossipee Fraud").  The 1138 Ossipee Fraud was directed by Chinapen and Ramgobin, for their and Defendants' benefit through participation in their fraudulent conspiracy and criminal enterprise.

298.     Chinapen, Ramgobin and Remedios knew the 1138 Ossipee Fraud was false at the time it was made because they knew that the property did not need $30,000 in repairs, the buyer

did not need $50,000 "for Covid," nor were there any other legitimate bases for the total $80,000 seller credit Remedios approved.

299.    The sale closed on June 4, 2020 at a final sale price of $270,000, which included a reduction of $80,000 for the fraudulent and fabricated seller credits Remedios approved and applied at the direction of Chinapen and Ramgobin.

300.    Defendant Sheldon May served as the closing agent on the transaction, acting at all times on behalf of Defendants' fraudulent conspiracy and criminal enterprise in its actions relating to the sale of the 1138 Ossipee Road property.

301.    Chinapen or his agent paid an illegal $2,000 kickback payment to Remedios as compensation for his criminal conduct to facilitate the unlawful sale of the 1138 Ossipee Road property to Ramgobin (via OSSI1138 Group Corp), in furtherance of Defendants' fraudulent conspiracy and criminal enterprise.

302.    But for the fraudulent conduct of defendants OSSI1138 Group Corp, Chinapen, Ramgobin, Remedios, Malilay, and the Closing Agent Defendants, the 1138 Ossipee Road property would have sold for $350,000.

*204 1st Avenue, East Northport, NY*

303.    Using artifice and deceit, Ramgobin purchased the property located at 204 1st Avenue in East Northport, New York outside the normal process on the Hubzu platform for $13,000 less than a legitimate bidder had offered to pay.

304.    When the final auction cycle for the property started, the list price was $349,800, the starting bid price was $255,000, and the seller's confidential reserve price was $318,318.

305.    The highest bid by a bona fide third party bidder in the final auction cycle was $268,000, which was below the seller's reserve price.

306.    On April 30, 2020, defendant Tung Nguyen emailed Remedios, in furtherance of Defendants' fraudulent conspiracy and criminal enterprise, using wires across international and/or state lines, and advised Remedios that she had an "investor" (Ramgobin) interested in purchasing the 204 1st Avenue property for $240,000, with a 30-day close. In her email, Nguyen conveys the following message from the broker (Chinapen) regarding the property: "This house has gone around more times than I can remember…..The house have been vacant for a long period of time now.  It have weathered several storms and as you can see from the pictures a huge tree has come down and gone through the house literally…With all the rain it is saturated inside now….it was in rough shape to start with.  Now the house is just sitting there deteriorating as the days go by."

307.    On May 18, 2020, Remedios, using wires across international and/or state lines, requested the seller's approval to accept the $255,000 offer from 204 1st Avenue Group Corp that had been submitted outside the Hubzu system.

308.    Although he had a duty to do so, Remedios knowingly and purposefully did not disclose to the seller that a legitimate bidder had submitted a bid for $268,000 for the property, which was $13,000 higher than Ramgobin's offer (the "204 1st Avenue Fraud").  Remedios did not disclose that information to the seller for the specific purpose of aiding and abetting defendants Ramgobin and Chinapen in their fraudulent conspiracy and criminal enterprise to purchase the property for $13,000 less than a legitimate buyer would have otherwise paid for the property.

309.    On May 19, 2020, Remedios emailed Nguyen and advised her that the "[o]ffer of $255,000 is approved," indicating to Nguyen the amount the seller agreed to accept for the

property for the specific purpose of informing Ramgobin and Chinapen so that they could achieve yet another objective of their fraudulent conspiracy and criminal enterprise.

310.    In reliance on the information provided by Remedios, on May 19, 2020, the seller agreed to accept Ramgobin's $255,000 offer.

311.    The seller would not have accepted Ramgobin's $255,000 offer but for the 204 1st Avenue Fraud.

312.    On May 19, 2020, defendant Ramgobin formed defendant 204 1st Avenue Group Corp, a New York corporation, to consummate Defendants' fraudulent conspiracy by serving as the entity that would purchase the property.

313.    On May 21, 2020, Ramgobin, on behalf of 204 1st Avenue Group Corp, signed a PSA to acquire the 204 1st Avenue property.

314.    The sale closed on June 30, 2020 at a final sale price of $255,000.

315.    Voro LLC (Chinapen) served as the buyer's agent in connection with the transaction, Torres served as the listing agent, and Sheldon May served as the closing agent. All of them acted on behalf of Defendants' fraudulent conspiracy and criminal enterprise in their actions relating to the sale of the 204 1st Avenue property.

316.    Chinapen or his agent paid an illegal $2,000 kickback payment to Remedios as compensation for his criminal conduct to facilitate the unlawful sale of the 204 1st Avenue property to Ramgobin (via 204 1st Avenue Group Corp), in furtherance of Defendants' fraudulent conspiracy and criminal enterprise.

317.    But for the fraudulent conduct of defendants Voro LLC, Chinapen, 204 1st Avenue Group Corp, Ramgobin, Remedios, Torres, Malilay, and the Closing Agent Defendants, the 204 1st Avenue property would have sold for at least $268,000.

318.   But for the fraudulent conduct of defendants Voro LLC, Chinapen, 204 1st Avenue Group Corp, Ramgobin, Remedios, Torres, Malilay, and the Closing Agent Defendants, plaintiff AOA would have received a larger buyer's premium and plaintiff RHSS would have received a larger commission based upon the difference between the price that the property should have sold for and the actual sale price that defendants Voro LLC, Chinapen, 204 1st Avenue Group Corp, Ramgobin, Remedios, Torres, Malilay, and the Closing Agent Defendants procured through their concerted fraud.

### *48 Twin River Drive, Oakdale, NY*

319.   Using deceit and artifice, Defendant Ramgobin purchased the property located at 48 Twin River Drive in Oakdale, New York outside the normal process on the Hubzu platform for approximately $75,000 less than she should have paid.

320.   When the final auction cycle for the property started, the list price was $649,000, the starting bid price was $414,000, and the seller's confidential reserve price was $577,610.

321.   No bids were submitted during that final auction cycle.

322.   Upon information and belief, Remedios, in furtherance of Defendants' fraudulent conspiracy and criminal enterprise and using wires across international and/or state lines, advised defendant Tung Nguyen of the amount the seller was willing to accept for the 48 Twin River Drive property and sent fraudulent emails to make the deal look legitimate.

323.   Specifically, on or about June 16, 2020, Nguyen emailed Remedios across international and/or state lines and advised Remedios that an "investor" was interested in the 48 Twin River Drive property and was willing to make an all cash offer of $517,000.

324.    Remedios responded to Nguyen the next day, June 17, 2020.  Remedios advised Nguyen that the seller would accept $518,000 for the property.  Predictably, Nguyen responded promptly and advised Remedios that the "investor" (*i.e.,* Chinapen) accepted.

325.    That same day, defendant Ramgobin formed defendant Twin River Group Corp, a New York corporation, to consummate Defendants' fraudulent conspiracy by serving as the entity that would purchase the 48 Twin River Drive property.

326.    On June 22, 2020, Ramgobin, on behalf of Twin River Group Corp, signed a PSA to acquire the 48 Twin River Drive property.

327.    Prior to closing, on July 16, 2020, Remedios, acting on behalf of Ramgobin and Chinapen and in furtherance of Defendants' fraudulent conspiracy and criminal enterprise, manually approved a $10,000 seller credit in favor of Twin River Group Corp that Remedios and Tung Nguyen represented was needed because of the buyer's salary being reduced "due to Covid" and the buyer's hard money lender being short $25,000 (the "48 Twin River Fraud").

328.    Ramgobin, Chinapen Remedios and Tung Nguyen knew the 48 Twin River Fraud was false at the time because they all knew the buyer did not need $10,000 "for Covid," because of a salary reduction, nor were there any other legitimate bases for the $10,000 seller credit Remedios approved.

329.    The sale closed on July 24, 2020 at an effective final sale price $508,000, which included a reduction of $10,000 for the fraudulent and fabricated seller credit Remedios applied.

330.    Voro LLC (Chinapen) served as the buyer's agent in connection with the transaction, and Sheldon May served as the closing agent. All of them acted on behalf of Defendants' fraudulent conspiracy and criminal enterprise in their actions relating to the sale of the 48 Twin River Drive property.

331.    But for the fraudulent conduct of defendants Voro LLC, Chinapen, Twin River Group Corp, Ramgobin, Remedios, Malilay, and the Closing Agent Defendants, the 48 Twin River Drive property would have sold for at least $583,386.

### *135 Robby Lane, New Hyde Park, NY*

332.    Using deceit and artifice, Ramgobin purchased the property located at 135 Robby Lane in New Hyde Park, New York outside the normal process on the Hubzu platform for approximately $100,000 less than a legitimate bidder had offered to pay.

333.    When the property was first listed on Hubzu on January 22, 2020, the list price was $816,200, the starting bid price was 552,000, and the seller's confidential reserve price was $726,418.

334.    Three days later, on January 24, 2020, a bid of $822,500 was accepted.  The property then remained under contract for more than five months until it was abruptly cancelled on June 2, 2020.

335.    On May 29, 2020, defendant Allysa Nguyen emailed Remedios, in furtherance of Defendants' fraudulent conspiracy and criminal enterprise, using wires across international and/or state lines, and advised Remedios that she had a buyer interested in purchasing the 135 Robby Lane property for $675,000. Two days later on June 1, 2020, Remedios responded to Nguyen and advised her that the offer was approved.

336.    The same day, June 1, 2020, Ramgobin formed defendant Robby Lane Group Corp, a New York corporation, to consummate Defendants' fraudulent conspiracy by serving as the entity that would purchase the Robby Lane property.

337.    Using wires across international and/or state lines, Remedios sent the seller a request for approval to accept the $675,000 offer from Robby Lane Group Corp on or about June

3, 2020.  Remedios intentionally omitted from that request for approval the internal "asset value" of $770,000 and the then-current MLS list price of the property, $816,200 ( the "Robby Lane Fraud No. 1").  Remedios committed the Robby Lane Fraud No. 1 in concert with Ramgobin and Chinapen, at their direction and for their benefit.

338.   Remedios had a duty to provide the seller with the list price and asset value for the property in conjunction with his request for approval of the $675,000 offer submitted by Ramgobin outside the Hubzu platform.   Indeed, internal procedures required Remedios to provide that information to the seller, especially where, as in this case, Remedios requested approval for an offer nearly $100,000 lower than the most recent internal valuation of the property.

339.   If Remedios had not committed the Robby Lane Fraud No. 1, the seller would not have accepted or authorized the sale to defendant Robby Lane Group Corp for $675,000.

340.   Because of the Robby Lane Fraud No. 1, however, Ramgobin, on behalf of Robby Lane Group Corp, signed a PSA on June 3, 2020 to acquire the property for $675,000.

341.   Prior to closing, on or around June 22, 2020, Remedios fraudulently represented to the seller, by wire across international and/or state lines, that the buyer (Robby Lane Group Corp) did not have sufficient funds to close because its lender reduced the loan amount. Remedios intentionally omitted the ratio of the loan proceeds to the actual sale price from his request to the seller, and instead included only the ratio of the loan proceeds to the much higher internal asset value (the "Robby Lane Fraud No. 2," and collectively with the Robby Lane Fraud No. 1, the "Robby Lane Fraud").  Remedios committed the Robby Lane Fraud No. 2 in concert with Ramgobin and Chinapen, at their direction and for their benefit.

342.    In reliance upon the Robby Lane Fraud No. 2, the seller agreed to provide a $20,000 seller credit, reducing the effective final purchase price to $655,000.

343.    Remedios, Chinapen and Ramgobin knew the Robby Lane No. 2 was false at the time it was made because they knew that the $675,000 offer from Ramgobin and Chinapen was a cash offer and that they neither needed nor intended to seek financing to facilitate the purchase.

344.    If Remedios, Chinapen and Ramgobin had not committed the Robby Lane Fraud No. 2, the seller would not have approved a seller credit of $20,000 to help offset the fictional loan shortfall Remedios alleged.

345.    The sale closed on June 25, 2020 at a final effective sale price of $655,000, which included the $20,000 seller credit fraudulently obtained by Remedios at the direction of Chinapen and Ramgobin and for their benefit.

346.    Voro LLC (Chinapen) served as the buyer's agent in connection with the transaction, and Sheldon May served as the closing agent.  All of them acted on behalf of Defendants' fraudulent conspiracy and criminal enterprise in their actions relating to the sale of the 135 Robby Lane property.

347.    Chinapen or his agent paid an illegal $15,000 kickback payment to Remedios as compensation for his criminal conduct to facilitate the unlawful sale of the 135 Robby Lane property to Ramgobin (via Robby Lane Group Corp), in furtherance of Defendants' fraudulent conspiracy and criminal enterprise.

348.    But for the fraudulent conduct of defendants Voro LLC, Chinapen, Robby Lane Group Corp, Ramgobin, Remedios, Malilay, and the Closing Agent Defendants, the 135 Robby Lane property would have sold for at least $755,475.

349.    But for the fraudulent conduct of defendants Voro LLC, Chinapen, Robby Lane Group Corp, Ramgobin, Remedios, Malilay, and the Closing Agent Defendants, plaintiff AOA would have received a larger buyer's premium and plaintiff RHSS would have received a larger commission based upon the difference between the price that the property should have sold for and the actual sale price that defendants Voro LLC, Chinapen, Robby Lane Group Corp, Ramgobin, Remedios, Malilay, and the Closing Agent Defendants procured through their concerted fraud.

### *155 Lincoln Avenue, Yonkers, NY*

350.    Using deceit and artifice, Defendant Ramgobin purchased the property located at 155 Lincoln Avenue in Yonkers, New York outside the normal process on the Hubzu platform for approximately $91,000 less than a legitimate bidder had offered to pay.

351.    When the final auction cycle for the property started, the list price was $506,200, the starting bid price was $369,000, and the seller's confidential reserve price was $450,518.

352.    The highest bid by a bona fide third party bidder in the final auction cycle was $538,518, which was above the seller's reserve price.

353.    On June 4, 2020, defendant Allysa Nguyen emailed Remedios, in furtherance of Defendants' fraudulent conspiracy and criminal enterprise, using wires across international and/or state lines, and advised Remedios that she had an "investor" (Ramgobin) interested in purchasing the 155 Lincoln Avenue property for $385,000, all cash. The same day, Remedios responded that another offer had already been accepted, that the buyer had signed a PSA and that it was "with Torres." Nguyen requested that Remedios keep her offer in mind should the deal fall through and Remedios agreed.

354.    Then on June 25, 2020, Allyssa Nguyen emailed Remedios, in furtherance of Defendants' fraudulent conspiracy and criminal enterprise, using wires across international and/or state lines, and advised Remedios that she has an "investor" (still Ramgobin), interested in purchasing the 155 Lincoln Avenue property for $400,000 cash.   Not even two hours later, Remedios responded to Nguyen via email and advised that the offer was accepted.

355.    The same date, June 25, 2020, defendant Ramgobin formed defendant Lincoln 155 Group Corp, a New York corporation, to consummate Defendants' fraudulent conspiracy by serving as the entity that would purchase the 155 Lincoln Avenue property.

356.    Then, on or about June 26, 2020, Remedios, using wires across international and/or state lines, acting at the direction of Chinapen and Ramgobin, contacted the seller and requested approval to accept a $400,000 offer submitted manually by defendant Ramgobin outside of the Hubzu platform.   In furtherance of Defendants' fraudulent conspiracy and criminal enterprise, Remedios did not disclose to the seller that there was a $538,518 bid from a bona fide bidder, which was above the seller's confidential reserve price, despite the fact that Remedios had a duty to disclose that material information to the seller (the "155 Lincoln Avenue Fraud"). Remedios intentionally did not disclose that information at the direction of Chinapen and Ramgobin and/or with their knowledge and consent, and for their benefit.

357.    The seller would not have approved the sale to Lincoln 155 Group Corp but for the 155 Lincoln Avenue Fraud.

358.    The sale closed on July 31, 2020 at a final sale price of $400,000.

359.    Voro LLC (Chinapen) served as the buyer's agent in connection with the transaction, and Sheldon May served as the closing agent.   All of them acted on behalf of

Defendants' fraudulent conspiracy and criminal enterprise in their actions relating to the sale of the 155 Lincoln Avenue property.

360.    Chinapen or his agent paid an illegal $7,000 kickback payment to Remedios as compensation for his criminal conduct to facilitate the unlawful sale of the 155 Lincoln Avenue property to Ramgobin (via Lincoln 155 Group Corp), in furtherance of Defendants' fraudulent conspiracy and criminal enterprise.

361.    But for the fraudulent conduct of defendants Voro LLC, Chinapen, Lincoln 155 Group Corp, Ramgobin, Remedios, Malilay, and the Closing Agent Defendants, the 155 Lincoln Avenue property would have sold for at least $491,065.

362.    But for the fraudulent conduct of defendants Voro LLC, Chinapen, Lincoln 155 Group Corp, Ramgobin, Remedios, Malilay, and the Closing Agent Defendants, plaintiff AOA would have received a larger buyer's premium and plaintiff RHSS would have received a larger commission based upon the difference between the price that the property should have sold for and the actual sale price that defendants Voro LLC, Chinapen, Lincoln 155 Group Corp, Ramgobin, Remedios, Malilay, and the Closing Agent Defendants procured through their concerted fraud.

*38 Leland Avenue, New Rochelle, NY*

363.    Using deceit and artifice, Defendant Ramgobin purchased the property located at 38 Leland Avenue in New Rochelle, New York outside the normal process on the Hubzu platform for approximately $65,000 less than a legitimate bidder had offered to pay.

364.    When the final auction cycle for the property started, the list price was $358,900, the starting bid price was $258,000, and the seller's confidential reserve price was $323,010.

365.    The highest bid by a bona fide third party bidder in the final auction cycle was $376,500, which was above the seller's reserve price.

366.    Despite that, on May 2, 2020, Remedios, using wires across international and/or state lines, contacted the seller and asked if the seller would accept an offer of $280,000 from defendant Ramgobin submitted manually outside the Hubzu platform.   In furtherance of Defendants' fraudulent conspiracy and criminal enterprise, Remedios did not inform the seller that there was a bona fide bid of $376,500 for the 38 Leland property as well as other bids around $370,000 submitted through the Hubzu platform (the "38 Leland Fraud No. 1"). Remedios did not disclose that information, despite having a duty to do so at the direction of and/or with the knowledge and consent of Chinapen and Ramgobin and for their benefit.

367.    Relying upon the 38 Leland Fraud No. 1, the seller accepted Ramgobin's offer of $280,000.  But for the 38 Leland Fraud No. 1, the seller would not have accepted the $280,000 offer from Ramgobin.

368.    Chinapen, Ramgobin and Remedios knew the 38 Leland Fraud No. 1 was false because they knew that there were bona fide third party bidders willing and able to pay $100,000 more than Ramgobin for the 38 Leland Avenue property.

369.    On May 4, 2020, Ramgobin formed defendant 38 Leland Group Corp, a New York corporation, to consummate Defendants' fraudulent conspiracy by serving as the entity that would purchase the 38 Leland Avenue property.

370.    On May 7, 2020, Ramgobin, on behalf of 38 Leland Group Corp, signed a PSA to acquire the 38 Leland Avenue property.

371.    Prior to closing, on June 8, 2020, Remedios, acting on behalf of Chinapen and in furtherance of Defendants' fraudulent conspiracy and criminal enterprise, manually approved a

$10,000 seller credit in favor of 38 Leland Group Corp that Remedios and Tung Nguyen falsely represented was necessary for the buyer to close on the property because of Covid-19 (the "38 Leland Fraud No. 2," and, collectively with the 38 Leland Fraud No. 1, the "38 Leland Fraud").

372.    Remedios, Chinapen, Ramgobin and Tung Ngueyn knew the 38 Leland Fraud No. 2 was false at the time because they knew that the buyer did not need a $10,000 seller credit to close due to Covid-19, nor was there any other legitimate basis for the $10,000 seller credit Remedios approved.

373.    The sale closed on June 30, 2020 at a final effective sale price of $270,000, which reflected the fraudulent $10,000 seller credit Remedios unilaterally approved for the benefit of Ramgobin and Chinapen.

374.    Voro LLC (Chinapen) served as the buyer's agent in connection with the transaction, Torres served as the listing agent, and Sheldon May served as the closing agent.  All of them acted on behalf of Defendants' fraudulent conspiracy and criminal enterprise in their actions relating to the sale of the 38 Leland Avenue property.

375.    Chinapen or his agent paid an illegal $5,000 kickback payment to Remedios as compensation for his criminal conduct to facilitate the unlawful sale of the 38 Leland Avenue property to Ramgobin (via 38 Leland Group Corp), in furtherance of Defendants' fraudulent conspiracy and criminal enterprise.

376.    But for the fraudulent conduct of defendants Voro LLC, Chinapen, 38 Leland Group Corp, Ramgobin, Remedios, Torres, Malilay, and the Closing Agent Defendants, the 38 Leland Avenue property would have sold for at least $335,930.

377.    But for the fraudulent conduct of defendants Voro LLC, Chinapen, 38 Leland Group Corp, Ramgobin, Remedios, Torres, Malilay, and the Closing Agent Defendants, plaintiff

AOA would have received a larger buyer's premium and plaintiff RHSS would have received a larger commission based upon the difference between the price that the property should have sold for and the actual sale price that defendants Voro LLC, Chinapen, 38 Leland Group Corp, Ramgobin, Remedios, Torres, Malilay, and the Closing Agent Defendants procured through their concerted fraud.

*26 Oak Avenue, Hempstead, NY*

378.    Using deceit and artifice, Defendant Ramgobin purchased the property located at 26 Oak Avenue in Hempstead, New York outside the normal process on the Hubzu platform for $99,000 less than a legitimate bidder had offered to pay.

379.    When the final auction cycle for the property started, the list price was $256,520, the starting bid price was $176,000, and the seller's confidential reserve price was $228,303.

380.    During that final auction cycle, a bona fide third party bidder submitted the high bid of $290,000, which was above the seller's confidential reserve price.

381.    Although Remedios had a duty to send a PSA to the prevailing bidder because the bid was above the seller's confidential reserve price, Remedios, using wires across international and/or state lines, manipulated the Hubzu system so that it did not send a proposed PSA to that bona fide prevailing bidder.

382.    On February 26, 2020, using wires across international and/or state lines, and in furtherance of Defendants' fraudulent conspiracy and criminal enterprise, defendant Tung Nguyen emailed Remedios the Multiple Property Offer, which included an offer to purchase the 26 Oak Avenue property for $200,000.

383.    That same day, Remedios, using wires across international and/or state lines, emailed the seller and requested approval to sell the property to Ramgobin for $200,000.

384.    Remedios knowingly and purposefully did not disclose to the seller that a legitimate bidder had submitted a prevailing bid in excess of the seller's confidential reserve price during the last auction cycle (the "26 Oak Fraud No. 1").  Although Remedios had a duty to disclose that information to the seller, he did not do so at the direction of and/or with the knowledge and consent of Ramgobin and Chinapen, so that they could succeed in their fraudulent conspiracy and criminal enterprise to purchase the property for over $90,000 less than a legitimate buyer would have otherwise paid for the property.

385.    In reliance on the information provided by Remedios, the seller agreed to accept Ramgobin's $200,000 offer.

386.    On February 27, 2020, Ramgobin formed defendant Oaka26 Group Corp as a New York corporation to consummate Defendants' fraudulent conspiracy by serving as the entity that purchased the 26 Oak Avenue property.

387.    On or around March 5, 2020, Ramgobin signed a PSA on behalf of Oaka26 Group Corp to acquire the property.

388.    Following execution of the PSA, Remedios, acting at the direction of Chinapen and Ramgobin and for their benefit, approved an unsubstantiated and unwarranted $9,000 seller credit.  Remedios approved the seller credit despite knowing that it was fraudulent because he had no basis for issuing the credit (the "26 Oak Fraud No. 2" and, collectively with 26 Oak Fraud No. 1, the "26 Oak Fraud").

389.    The sale closed on March 31, 2020 at an effective final sale price of $191,000.

390.    Voro LLC (Chinapen) served as the buyer's agent in connection with the transaction, and Sheldon May served as the closing agent.  All of them acted on behalf of

Defendants' fraudulent conspiracy and criminal enterprise in their actions relating to the sale of the 26 Oak Avenue property.

391. Chinapen or his agent paid an illegal $8,000 kickback payment to Remedios as compensation for his criminal conduct to facilitate the unlawful sale of 26 Oak Avenue property to Ramgobin (via Oaka26 Group Corp), in furtherance of Defendants' fraudulent conspiracy and criminal enterprise.

392. But for the fraudulent conduct of defendants Voro LLC, Chinapen, Oaka26 Group Corp, Ramgobin, Remedios, Malilay, and the Closing Agent Defendants, the 26 Oak Avenue property would have sold for at least $290,000.

393. But for the fraudulent conduct of defendants Voro LLC, Chinapen, Oaka26 Group Corp, Ramgobin, Remedios, Malilay, and the Closing Agent Defendants, plaintiff AOA would have received a larger buyer's premium and plaintiff RHSS would have received a larger commission based upon the difference between the price that the property should have sold for and the actual sale price that defendants Voro LLC, Chinapen, Oaka26 Group Corp, Ramgobin, Remedios and the Closing Agent Defendants procured through their concerted fraud.

*25 Parma Road, Island Park, NY*

394. Using deceit and artifice, Defendant Ramgobin purchased the property located at 25 Parma Road in Island Park, New York outside the normal process on the Hubzu platform for approximately $55,000 than she should have paid.

395. When the final auction cycle for the property started, the list price was $184,100, the starting bid price was $136,000, and the seller's confidential reserve price was $163,849.

396. No bids were submitted during that final auction cycle.

397.    Upon information and belief, Remedios, in furtherance of Defendants' fraudulent conspiracy and criminal enterprise and using wires across international and/or state lines, advised defendant Tung Nguyen of the amount the seller was willing to accept for the 25 Parma Road property and sent fraudulent emails to make the deal look legitimate.

398.    Specifically, on May 22, 2020, one of defendants Tung Nguyen, Allyssa Nguyen and Torres emailed Remedios across international and/or state lines and advised defendant Remedios that an "investor" was interested in the 25 Parma Road property and was willing to make an all cash offer of $125,000.

399.    Remedios responded on May 22, 2020 and advised that the seller would accept $125,000 for the property.

400.    That same day, defendant Ramgobin formed defendant 25 Parma Group Corp, a New York corporation, to consummate Defendants' fraudulent conspiracy by serving as the entity that would purchase the 25 Parma Road property.

401.    On May 26, 2020, Ramgobin signed a PSA on behalf of 25 Parma Group Corp to acquire the property.

402.    One June 5, 2020, in furtherance of Defendants' fraudulent conspiracy and criminal enterprise, using wires across international and/or state lines, defendant Allysa Nguyen sent the following email message to Remedios and another AOA employee, Subhadeep Das:

> The buyer for this property just called me.  They are getting hard money on this house. Due to covid, the lender will not lend the full boat to the buyers.  Buyers are asking if the seller will give a 10,000.00 credit.

403.    Then again on June 22, 2020, in furtherance of Defendants' fraudulent conspiracy and criminal enterprise, using wires across international and/or state lines, Allysa Nguyen sent the following email message to Remedios and Das:

Due to covid the Hard money lender is lending a bit less.  Buyer is asking if the seller will grant a credit of 10,000.00.

404.     At the time Allysa Nguyen sent that email, she knew her statement was false and she intended that AOA, Altisource and its seller client would rely upon that statement in granting a baseless $10,000 seller credit.

405.     Two minutes later, Remedios replied by email to Allysa Nguyen alone and asked "[d]id we not get a credit on this already?"  Remedios knowingly and intentionally did not include Das on his email to Allysa because he believed his reply could concern Das and risk exposing Defendants' fraudulent conspiracy and criminal enterprise.

406.     Allysa replied by email less than a minute later, adding her Sheldon May colleague, defendant Tung Nguyen, to the thread and asking simply: "Tung?"

407.     Prior to closing, Remedios, acting on behalf of Chinapen, Ramgobin and Allysa Nguyen, and in furtherance of Defendants' fraudulent conspiracy and criminal enterprise, manually approved a $10,000 seller credit in favor of 25 Parma Group Corp without any basis (the "25 Parma Group Fraud").

408.     Chinapen, Ramgobin, Allysa Nguyen and Remedios all knew the 25 Parma Group Fraud was false at the time because they all knew that there was no legitimate basis for the $10,000 seller credit Remedios approved.

409.     The sale closed on June 30, 2020 at an effective final sale price of $115,000, which included a reduction of $10,000 for the fraudulent and fabricated seller credit Remedios applied.

410.     Voro LLC (Chinapen) served as the buyer's agent in connection with the transaction, Torres served as the listing agent, and Sheldon May served as the closing agent.  All

of them acted on behalf of Defendants' fraudulent conspiracy and criminal enterprise in their actions relating to the sale of the 25 Parma Road property.

411.    Chinapen or his agent paid an illegal $1,000 kickback payment to Remedios as compensation for his criminal conduct to facilitate the unlawful sale of the 25 Parma Road property to Ramgobin (via 25 Parma Group Corp), in furtherance of Defendants' fraudulent conspiracy and criminal enterprise.

412.    But for the fraudulent conduct of defendants Voro LLC, Chinapen, 25 Parma Group Corp, Ramgobin, Remedios, Torres, Malilay, and the Closing Agent Defendants, the 25 Parma Road property would have sold for at least $170,403.

### 25-60 83rd Street, East Elmhurst, NY

413.    Using deceit and artifice, Defendant Ramgobin purchased the property located at 25-60 83rd Street in East Elmhurst, New York outside the normal process on the Hubzu platform for $212,040 less than a legitimate bidder had offered to pay.

414.    When the final auction cycle for the property started, the list price was $805,600, the starting bid price was $551,000, and the seller's confidential reserve price was $725,040.

415.    As of March 2020, there was an active legitimate bid for $882,040, which was above the seller's confidential reserve price.

416.    On March 19, 2020, using wires across international and/or state lines, defendant Alyssa Nguyen, acting on behalf of Chinapen and Ramgobin, sent an email to Remedios stating that "an investor" (Ramgobin and Chinapen) wanted to purchase the 25-60 83rd Street property for $675,000.

417.    That same day, Remedios, in furtherance of Defendants' fraudulent conspiracy and criminal enterprise, using wires across international and/or state lines, emailed the seller and requested approval to sell the 25-60 83rd Street property to "an investor" for $675,000.

418.    Although he had a duty to do so, Remedios knowingly and purposefully did not disclose to the seller that there was an active bid of $882,040 from a legitimate bidder, which was above the seller's confidential reserve price (the "83rd Street Fraud No. 1").  Although he had a duty to do so, Remedios did not disclose that information to the seller for the specific purpose of aiding and abetting defendants Ramgobin and Chinapen in their fraudulent conspiracy and criminal enterprise to purchase the property for nearly $200,000 less than a legitimate buyer would have otherwise paid for the property.

419.    Although the seller rejected Ramgobin's $675,000 offer, the seller, in reliance on the information provided by Remedios, directed Remedios to relay a counter-offer of $700,000 to Ramgobin.

420.    The seller would not have agreed to sell the 25-60 83rd Street property for $700,000 but for the 83rd Street Fraud No. 1, as Ramgobin's offer was nearly $200,000 less than an active bid for the property submitted by a legitimate bidder through the Hubzu platform.

421.    On March 20, 2020, using wires across international and/or state lines, Remedios emailed Alyssa Nguyen and advised that the seller would sell the 25-60 83rd Street property for $700,000.

422.    On March 30, 2020, Ramgobin formed defendant AMC83S Group Corp, a New York corporation, to consummate Defendants' fraudulent conspiracy by serving as the entity that would purchase the 25-60 83rd Street property.

423. On April 1, 2020, Ramgobin, on behalf of AMC83S Group Corp, signed a PSA to acquire the 25-60 83rd Street property.

424. But Chinapen and Ramgobin were not satisfied with merely buying the property for $180,000 less than a bona fide third party had offered, and demanded an additional seller credit of $30,000. Accordingly, on May 1, 2020, Remedios fraudulently represented to the seller in furtherance of his conspiracy with Chinapen and Ramgobin, that the investor (defendant Ramgobin) needed a $30,000 seller credit because the hard money lender cut the amount they were willing to loan due to Covid (the "83rd Street Fraud No. 2" and, collectively with the 83rd Street Fraud No. 1, the "83rd Street Fraud").

425. In reliance upon the 83rd Street Fraud No. 2, on May 4, 2020, the seller agreed to provide a $30,000 seller credit, reducing the effective final purchase price to $670,000.

426. Remedios, Chinapen and Ramgobin knew the 83rd Street Fraud No. 2 was false at the time it was made because they all knew there was no legitimate basis for the $30,000 seller credit Remedios had approved.

427. The sale closed on June 18, 2020 at the effective final sale price of $670,000.

428. But for the 83rd Street Fraud, the seller would not have approved the sale of the property to defendant AMC83S Group Corp.

429. Voro LLC (Chinapen) served as the buyer's agent in connection with the transaction, and Sheldon May served as the closing agent. All of them acted on behalf of Defendants' fraudulent conspiracy and criminal enterprise in their actions relating to the sale of the 25-60 83rd Street property.

430. Chinapen or his agent paid an illegal $5,000 kickback payment to Remedios as compensation for his criminal conduct to facilitate the unlawful sale of the 25-60 83rd Street

property to Ramgobin (via AMC83S Group Corp), in furtherance of Defendants' fraudulent conspiracy and criminal enterprise.

431.    But for the fraudulent conduct of defendants Voro LLC, Chinapen, AMC83S Group Corp, Ramgobin, Remedios, Malilay, and the Closing Agent Defendants, the 25-60 83rd Street property would have sold for $882,040.

432.    But for the fraudulent conduct of defendants Voro LLC, Chinapen, AMC83S Group Corp, Ramgobin, Remedios, Malilay, and the Closing Agent Defendants, plaintiff AOA would have received a larger buyer's premium and plaintiff RHSS would have received a larger commission based upon the difference between the price that the property should have sold for and the actual sale price that defendants Voro LLC, Chinapen, AMC83S Group Corp, Ramgobin, Remedios, Malilay, and the Closing Agent Defendants procured through their concerted fraud.

### *1710 N Spur Drive, Central Islip, NY*

433.    Using deceit and artifice, Defendant Ramgobin purchased the property located at 1710 N Spur Drive in Central Islip, New York outside the normal process on the Hubzu platform for approximately $108,000 less than a legitimate bidder had offered to pay.

434.    When the final auction cycle for the property started, the list price was $214,500, the starting bid price was $149,000, and the seller's confidential reserve price was $193,050.

435.    Although the prevailing bidder in the final auction failed to sign a PSA to purchase the 1710 N Spur Drive property, the final auction cycle yielded a backup bid of from a legitimate third party bidder in the final auction cycle of $303,000, which was above the seller's confidential reserve price.

436.    However, after the prevailing bidder failed to execute a PSA, defendant Torres, who was serving as the listing agent for the property, falsely represented to Remedios that the bidder who submitted the bona fide backup bid of $303,000 was a sham bidder who would not complete the transaction.  Torres made this false representation for the purpose of providing Remedios with a pretext to cancel the prevailing bid and then manually manipulate the Hubzu platform to sell the property for a much lower price to Chinapen and/or his agents who were knowingly participating in the fraudulent conspiracy and criminal enterprise.

437.    On May 28, 2020, Remedios then manually cancelled the $303,000 backup bid in the Hubzu system on the pretext, provided by Torres, that it had been submitted by a sham bidder.  At the time Remedios manually cancelled the bid, he knew the bid was legitimate or he had no reason to believe that the bid was illegitimate or that the bidder was a sham bidder.  He nevertheless acted on behalf of Ramgobin and Chinapen in furtherance of their directive to facilitate their purchase of the property for less than fair value, and much less than the bona fide third party bidder had already offered.

438.    Then on the same date, Remedios, using wires across international and/or state lines and in furtherance of Defendants' fraudulent conspiracy and criminal enterprise, emailed the seller to request approval to sell the property to an "investor" (Ramgobin) for $195,000.

439.    Although he had a duty to do so, Remedios knowingly and purposefully did not disclose to the seller that there had been a bid for $303,000, which was above the seller's confidential reserve price, nor did Remedios disclose that he had cancelled that bid based upon the false representation by Torres (the "1710 N Spur Fraud").  Remedios did not disclose that information at the direction of Chinapen and Ramgobin and/or with their knowledge and consent, for the purpose of facilitating their purchase of the property for approximately $108,000

less than a legitimate buyer would have otherwise paid for it, all as part of and in furtherance of Defendants' fraudulent conspiracy and criminal enterprise.

440.   In reliance on the information provided by Remedios, the seller agreed to accept the $195,000 offer from Ramgobin.

441.   The seller would not have accepted Ramgobin's $195,000 offer but for the 1710 N Spur Fraud.

442.   On May 29, 2020, Ramgobin formed defendant North Spur Group Corp, a New York corporation, to consummate Defendants' fraudulent conspiracy by serving as the entity that would purchase the 1710 N Spur Drive property.

443.   On June 2, 2020, Ramgobin, on behalf of North Spur Group Corp, signed a PSA to acquire the 1710 N Spur Drive property.

444.   The sale closed on June 26, 2020 at a final sale price of $195,000.

445.   Chinapen served as the buyer's agent in connection with the transaction, Torres served as the listing agent, and Sheldon May served as the closing agent.  All of them acted on behalf of Defendants' fraudulent conspiracy and criminal enterprise in their actions relating to the sale of the 1710 N Spur Drive property.

446.   Chinapen or his agent paid an illegal $3,000 kickback payment to Remedios as compensation for his criminal conduct to facilitate the unlawful sale of the 1710 N Spur Drive property to Ramgobin (via North Spur Group Corp), in furtherance of Defendants' fraudulent conspiracy and criminal enterprise.

447.   But for the fraudulent conduct of defendants Chinapen, North Spur Group Corp, Ramgobin, Remedios, Torres, Malilay, and the Closing Agent Defendants, the 1710 N Spur Drive property would have sold for $303,000.

448.     But for the fraudulent conduct of defendants Chinapen, North Spur Group Corp, Ramgobin, Remedios, Torres, Malilay, and the Closing Agent Defendants, plaintiff AOA would have received a larger buyer's premium and plaintiff RHSS would have received a larger commission based upon the difference between the price that the property should have sold for and the actual sale price that defendants Voro LLC, Chinapen, North Spur Group Corp, Ramgobin, Remedios, Torres, Malilay, and the Closing Agent Defendants procured through their concerted fraud.

### *100 Rose Avenue, Roosevelt, NY*

449.     Using deceit and artifice, Defendant Ramgobin purchased the property located at 100 Rose Avenue in Roosevelt, New York for approximately $100,000 less than a legitimate bidder had offered to pay.

450.     On November 1, 2019, Ramgobin formed defendant Rose100 Group Corp, a New York corporation, to consummate Defendants' fraudulent conspiracy by serving as the entity that would purchase the 100 Rose Avenue property.

451.     Sometime before the final auction cycle for the property, and in furtherance of Defendants' fraudulent conspiracy and criminal enterprise, Remedios, using wires across international and/or state lines, contacted Plaintiffs' asset valuation team and requested a reduction of the asset value of the property based on false representations about the property.

452.     On information and belief, Remedios contacted the asset valuation team at the direction of defendants Chinapen and Ramgobin, who had conveyed to Remedios their desire to purchase the property for substantially less than its value.

453.     Remedios, acting in furtherance of Defendants' fraudulent conspiracy and criminal enterprise, knowingly and purposefully made misrepresentations to Plaintiffs' asset

valuation team regarding the property so that they would reduce the asset value substantially, which would then make it much easier for Ramgobin to purchase the property for far less than its fair market value (the "100 Rose Fraud No. 1").

454.   As a direct and proximate result of the 100 Rose Fraud No. 1, Plaintiffs' asset valuation team reduced the asset value assigned to the 100 Rose Avenue property, which resulted in a $115,830 decrease in the seller's confidential reserve price, from $289,380 all the way down to $173,550.

455.   When the final auction cycle for the property started, the new list price was $195,000, the new starting bid price was $134,000, and the seller's confidential reserve price was now $173,550, all due to the 100 Rose Fraud No. 1.

456.   In furtherance of Defendants' fraudulent conspiracy and criminal enterprise, on or about February 27, 2020, defendant Tung Nguyen emailed Remedios, using wires across international and/or state lines, asking, on behalf of Chinapen and Ramgobin, that Remedios add the 100 Rose Avenue property to the Multiple Property Offer and inquiring whether the seller would accept $190,000 for it.

457.   The following day, Tung Nguyen emailed Remedios and asked him to "[p]lease tell the seller that [the 100 Rose Avenue] property is in a very bad neighborhood." Nguyen also asserted in his email that "[t]he occupants are drug dealers" and "the house is advertised as a multi-family" but "it is only a single family." Finally, Nguyen stated that "[d]ue to this there is a significant price difference."

458.   Armed with the misrepresentations from Tung Nguyen and the reduced asset value secured through the 100 Rose Fraud No. 1, Remedios contacted the seller via email using

wires across international and/or state lines and requested approval to accept an offer from an "investor" (Ramgobin) to purchase the property for $190.000.

459.    Remedios, acting in furtherance of Defendants' fraudulent conspiracy and criminal enterprise, knowingly and purposefully misrepresented to the seller that the asset value had been reduced to account for problems with the property so that defendants Ramgobin and Chinapen could succeed in their fraudulent conspiracy and criminal enterprise to purchase the property for significantly less than a legitimate buyer would have otherwise paid for the property (the "100 Rose Fraud No. 2" and, collectively with the 100 Rose Fraud No. 1, the "100 Rose Fraud").   Based on the 100 Rose Fraud, Remedios represented to the seller that the new and appropriate confidential reserve price was $173,550, which made the $190,000 offer from Ramgobin appear reasonable.

460.    On March 1, 2020, Remedios responded to Nguyen via email with a counter offer of $200,000 from the seller.

461.    On March 2, 2020, Nguyen replied to Remedios and asked whether the seller would accept $195,000 for the property.

462.    In reliance on the information provided by Remedios, the seller agreed to accept Ramgobin's $195,000 offer.

463.    The seller would not have accepted Ramgobin's $195,000 offer but for the 100 Rose Fraud.

464.    On March 5, 2020, Ramgobin, on behalf of Rose100 Group Corp, signed a PSA to acquire the 100 Rose Avenue property.

465.    The sale closed on June 30, 2020 at a final sale price of $195,000.

466.    Voro LLC (Chinapen) served as the buyer's agent in connection with the transaction, Torres served as the listing agent, and Sheldon May served as the closing agent.  All of them acted on behalf of Defendants' fraudulent conspiracy and criminal enterprise in their actions relating to the sale of the 100 Rose Avenue property.

467.    Chinapen or his agent paid an illegal $2,000 kickback payment to Remedios as compensation for his criminal conduct to facilitate the unlawful sale of the 100 Rose Avenue property to Ramgobin (via Rose100 Group Corp), in furtherance of Defendants' fraudulent conspiracy and criminal enterprise.

468.    But for the fraudulent conduct of defendants Voro LLC, Chinapen, Rose100 Group Corp, Ramgobin, Remedios, Torres, Malilay, and the Closing Agent Defendants, the 100 Rose Avenue property would have sold for at least $295,168.

469.    But for the fraudulent conduct of defendants Voro LLC, Chinapen, Rose100 Group Corp, Ramgobin, Remedios, Torres, Malilay, and the Closing Agent Defendants, plaintiff AOA would have received a larger buyer's premium and plaintiff RHSS would have received a larger commission based upon the difference between the price that the property should have sold for and the actual sale price that defendants Voro LLC, Chinapen, Rose100 Group Corp, Ramgobin, Remedios, Torres, Malilay, and the Closing Agent Defendants procured through their concerted fraud.

### *612 Miller Avenue, Freeport, NY*

470.    Using deceit and artifice, Defendant Ramgobin purchased the property located at 612 Miller Avenue in Freeport, New York for approximately $16,000 less than a legitimate bidder had offered to pay.

471.    When the final auction cycle for the property started, the list price was $287,200, the starting bid price was $206,000, and the seller's confidential reserve price was $261,352.

472.    Before or during that final auction cycle, Remedios, Torres and/or Malilay disclosed the seller's confidential reserve price to defendant Tung Nguyen and/or defendant Allysa Nguyen.

473.    On July 11, 2020, Allysa Nguyen emailed Remedios, in furtherance of Defendants' fraudulent conspiracy and criminal enterprise, using wires across international and/or state lines, and told Remedios that an "investor" was willing to pay $262,000 for the 612 Miller Avenue property, a figure above – *albeit just barely* – the  seller's confidential reserve price of $261,352.

474.    Remedios, in furtherance of Defendants' fraudulent conspiracy and criminal enterprise, using wires across international and/or state lines, replied to Allysa Nguyen's email on July 13, 2020 and requested the buyer's information.

475.    Next, in furtherance of Defendants' fraudulent conspiracy and criminal enterprise, using wires across state lines, defendant Ramgobin submitted a bid of $262,000 during the final auction cycle for the property.  Because her bid was above the seller's confidential reserve price, Remedios could accept her bid without obtaining independent approval from the seller.

476.    In furtherance of Defendants' fraudulent conspiracy and criminal enterprise, Remedios manipulated the Hubzu platform to manually accept Ramgobin's bid of $262,000.

477.    On July 13, 2020, Ramgobin formed defendant 612 Miller Ave Group Corp, a New York corporation, to consummate Defendants' fraudulent conspiracy by serving as the entity that would purchase the 612 Miller Avenue property.

478.    On July 17, 2020, Ramgobin, on behalf of 612 Miller Ave Group Corp, signed a PSA to acquire the 612 Miller Avenue property.

479.    Prior to closing, Remedios, acting on behalf of Ramgobin and Chinapen and in furtherance of Defendants' fraudulent conspiracy and criminal enterprise, manually approved a $12,000 seller credit in favor of 612 Miller Ave Group Corp without any basis (the "612 Miller Fraud").

480.    Chinapen, Ramgobin and Remedios knew the 612 Miller Fraud was false at the time because they knew that there was no legitimate basis for the $12,000 seller credit Remedios approved.

481.    The sale ultimately closed on August 1, 2020 at an effective final sale price of $250,000, which included the fraudulent $12,000 seller credit unilaterally approved by Remedios for the benefit of Chinapen and Ramgobin.

482.    Voro LLC (Chinapen) served as the buyer's agent in connection with the transaction, Torres served as the listing agent, and Sheldon May served as the closing agent.  All of them acted on behalf of Defendants' fraudulent conspiracy and criminal enterprise in their actions relating to the sale of the 612 Miller Avenue property.

483.    Chinapen or his agent paid an illegal $2,000 kickback payment to Remedios as compensation for his criminal conduct to facilitate the unlawful sale of the 612 Miller Avenue property to Ramgobin (via 612 Miller Ave Group Corp), in furtherance of Defendants' fraudulent conspiracy and criminal enterprise.

484.    But for the fraudulent conduct of defendants Voro LLC, Chinapen, 612 Miller Ave Group Corp, Ramgobin, Remedios, Torres, Malilay, and the Closing Agent Defendants, the 612 Miller Avenue Street property would have sold for at least $266,579.

485.     But for the fraudulent conduct of defendants Voro LLC, Chinapen, 612 Miller Ave Group Corp, Ramgobin, Remedios, Torres, Malilay, and the Closing Agent Defendants, plaintiff AOA would have received a larger buyer's premium and plaintiff RHSS would have received a larger commission based upon the difference between the price that the property should have sold for and the actual sale price that defendants Voro LLC, Chinapen, 612 Miller Ave Group Corp, Ramgobin, Remedios, Torres, Malilay, and the Closing Agent Defendants procured through their concerted fraud.

### *2221 Seaford Avenue, Seaford, NY*

486.     Using deceit and artifice, Defendant Ramgobin purchased the property located at 2221 Seaford Avenue in Seaford, New York outside the normal process on the Hubzu platform for approximately $7,000 less than she should have paid for it.

487.     When the final auction cycle for the property started, the list price was $448,300, the starting bid price was $268,000, and the seller's confidential reserve price was $330,457.

488.     On or about June 17, 2020, in furtherance of Defendants' fraudulent conspiracy and criminal enterprise, Remedios, using wires across international and/or state lines, facilitated submission to the seller of an offer from Ramgobin to purchase the 2221 Seaford Avenue property for $350,000.

489.     On June 22, 2020, the seller's representative responded to Remedios by email and inquired as to why he was seeking approval of an offer that was $70,000 below the asset value assigned by Plaintiffs' internal asset valuation team.

490.     After receiving the inquiry from the seller's representative, Remedios, in furtherance of Defendants' fraudulent conspiracy and criminal enterprise, using wires across international and/or state lines, promptly contacted Plaintiffs' asset valuation team and requested

a reduction of the asset value for the 2221 Seaford Avenue based upon his false representation that the only bids for the property were significantly below the asset value (the "Seaford Fraud No. 1").

491.    Remedios contacted the asset valuation team for the benefit of defendants Chinapen and Ramgobin, who had conveyed to Remedios their desire to purchase the property for $350,000, which they knew was well below the fair market value for the property.

492.    Remedios had a duty to inform the asset valuation team that he had only requested a reduction of the asset value upon receiving an inquiry from the seller's representative about the low $350,000 offer from Ramgobin that Remedios asked the seller to approve.  But Remedios, acting at the direction of Chinapen and Ramgobin and in furtherance of Defendants' fraudulent conspiracy and criminal enterprise, knowingly and purposefully did not disclose that information to the asset valuation team (the "Seaford Fraud No. 2").

493.    As a direct and proximate result of the Seaford Fraud No. 2, Plaintiffs' asset valuation team reduced the asset value assigned to the 2221 Seaford Avenue property in the Hubzu platform by $40,000, from $420,000 to $380,000.

494.    On June 23, 2020, after fraudulently inducing Plaintiffs' asset valuation team to reduce the asset value of the procuring the fraudulent reduction of the asset value assigned to the 2221 Seaford Avenue property, Remedios replied to the seller's representative by email and falsely represented that there was a request to reduce the asset value for the property because "the property was over-priced and the bids were not in line" (the "Seaford Fraud No. 3").

495.    In that same email to the seller's representative, Remedios also fraudulently represented that the $350,000 offer from Ramgobin was the highest offer that anyone had submitted for the property (the "Seaford Fraud No. 4").

496.     The seller's representative replied by email minutes later and asked whether Remedios could get the buyer to increase the offer to 95% of the newly-reduced asset value.

497.     Remedios, in furtherance of Defendants' fraudulent conspiracy and using wires across international and/or state lines, secured an increased offer of $360,000 from Ramgobin and Chinapen (94.74% of the newly-reduced asset value) and conveyed it by email to the seller's representative.

498.     Relying upon the 2221 Seaford Fraud No. 4, on June 23, 2020, the seller agreed to accept Ramgobin's $360,000 offer.

499.     The seller would not have accepted Ramgobin's $360,000 offer but for the 2221 Seaford Fraud No. 4.

500.     On June 23, 2020, Ramgobin formed defendant Seaford2221 Group Corp, a New York corporation, to consummate Defendants' fraudulent conspiracy by serving as the entity that would purchase the 2221 Seaford Avenue property.

501.     On June 26, 2020, Ramgobin, on behalf of Seaford2221 Group Corp, signed a PSA to acquire the 2221 Seaford Avenue property.

502.     Prior to closing, Remedios, acting on behalf of Ramgobin and Chinapen and in furtherance of Defendants' fraudulent conspiracy and criminal enterprise, manually approved a $5,000 seller credit in favor of Seaford2221 Group Corp without any basis (the "Seaford Fraud No. 5" and, collectively with the Seaford Fraud No. 1, the Seaford Fraud No. 2, the Seaford Fraud No. 3, and the Seaford Fraud No. 4, the "Seaford Fraud").

503.     Chinapen, Ramgobin and Remedios knew the Seaford Fraud was false at the time because they knew that there was no legitimate basis for the $5,000 seller credit Remedios approved.

504. The sale ultimately closed on August 13, 2020 at an effective final sale price of $355,000, which included the fraudulent $5,000 seller credit unilaterally approved by Remedios for the benefit of Chinapen and Ramgobin.

505. Voro LLC (Chinapen) served as the buyer's agent in connection with the transaction, and Sheldon May served as the closing agent. All of them acted on behalf of Defendants' fraudulent conspiracy and criminal enterprise in their actions relating to the sale of the 2221 Seaford Avenue property.

506. Chinapen or his agent paid an illegal $7,000 kickback payment to Remedios as compensation for his criminal conduct to facilitate the unlawful sale of the 2221 Seaford Avenue property to Ramgobin (via Seaford2221 Group Corp), in furtherance of Defendants' fraudulent conspiracy and criminal enterprise.

507. But for the fraudulent conduct of defendants Voro LLC, Chinapen, Seaford2221 Group Corp, Ramgobin, Remedios, Maliliay, and the Closing Agent Defendants, the 2221 Seaford Avenue property would have sold for at least $362,000.

508. But for the fraudulent conduct of defendants Voro LLC, Chinapen, Seaford2221 Group Corp, Ramgobin, Remedios, Malilay, and the Closing Agent Defendants, plaintiff AOA would have received a larger buyer's premium and plaintiff RHSS would have received a larger commission based upon the difference between the price that the property should have sold for and the actual sale price that defendants Voro LLC, Chinapen, Seaford2221 Group Corp, Ramgobin, Remedios, Malilay, and the Closing Agent Defendants procured through their concerted fraud.

*10 Hollywood Avenue, Lynbrook, NY*

509.     Using deceit and artifice, Ramgobin purchased the property located at 10 Hollywood Avenue in Lynbrook, New York outside the normal process on the Hubzu platform for nearly $55,000 less than a legitimate bidder had offered to pay.

510.     When the final auction cycle for the property started, the list price was $374,000, the starting bid price was $240,000, and the seller's confidential reserve price was $324,632.

511.     The highest bid by a bona fide third party bidder in the final auction cycle was $340,000, which was above the seller's confidential reserve price.

512.     Sometime on or before June 11, 2020, Remedios, Malilay or Torres facilitated the disclosure of the seller's confidential reserve price to Chinapen and Ramgobin.

513.     On June 11, 2020, in furtherance of Defendants' fraudulent conspiracy and criminal enterprise, defendant Allysa Nguyen, using wires across international and/or state lines, emailed Remedios and stated that an "investor" was willing to purchase the 10 Hollywood Avenue property for $325,000, an amount less than $500 above the seller's confidential reserve price.  The following day, Remedios responded via email and accepted the offer.

514.     Although Remedios should have sought to secure a PSA with the prevailing bidder for $340,000, Remedios, in furtherance of Defendants' fraudulent conspiracy and criminal enterprise, manipulated the Hubzu platform to accept the $325,000 offer from Ramgobin, which Remedios could accept without requesting approval from the seller because the offer was above – *albeit barely* – the seller's confidential reserve price.

515.     Although he had a duty to do so, Remedios knowingly and purposefully did not disclose to the seller that a legitimate bidder had submitted a bid for $15,000 more than the offer from Ramgobin (the "10 Hollywood Fraud No. 1").  Remedios did not disclose that information for the specific purpose of aiding and abetting defendants Ramgobin and Chinapen in their

fraudulent conspiracy and criminal enterprise to purchase the property for over $15,000 less than a legitimate buyer would have otherwise paid for it.

516.    The seller would not have accepted Ramgobin's $325,000 offer but for the 10 Hollywood Fraud No. 1.

517.    On June 12, 2020, Ramgobin formed defendant 10 Hollywood Group Corp, a New York corporation, to consummate Defendants' fraudulent conspiracy by serving as the entity that would purchase the 10 Hollywood Avenue property.

518.    On June 22, 2020, Ramgobin, on behalf of 10 Hollywood Group Corp, signed a PSA to acquire the 10 Hollywood Avenue property.

519.    On July 10, 2020, defendant Tung Nguyen emailed Remedios, in furtherance of Defendants' fraudulent conspiracy and criminal enterprise, using wires across international and/or state lines, and asked for a $35,000 seller credit because due to Covid, "the buyer's salary was reduced significantly," and due to an issue with financing. Remedios countered with a $15,000 credit and Nguyen responded that "Rosa is asking for 30K."

520.    Prior to closing, on July 10, 2020, Remedios, acting on behalf of Ramgobin and Chinapen, and in furtherance of Defendants' fraudulent conspiracy and criminal enterprise, manually approved a $26,000 seller credit in favor of 10 Hollywood Group Corp that Remedios and Allysa Nguyen falsely represented was due to Covid and the buyer (Ramgobin) being the recipient of a salary reduction (the "10 Hollywood Fraud No. 2" and, collectively with the 10 Hollywood Fraud No. 1, the "10 Hollywood Fraud").  On information and belief, Remedios and Allysa Nguyen made the false representation at the direction of Ramgobin and Chinapen and/or with their knowledge and assent.

521. Ramgobin, Chinapen, Remedios and Allysa Nguyen knew the 10 Hollywood Fraud No. 2 was false at the time because they all knew the buyer did not need $26,000 "for Covid," because of a salary reduction, nor were there any other legitimate bases for the $26,000 seller credit Remedios approved.

522. The closing on the 10 Hollywood Avenue property was supposed to take place in July of 2020. However, the Closing Agent Defendants repeatedly delayed the closing date at the directive of Ramgobin and Chinapen. When Altisource realized this was a consistent occurrence with the Closing Agent Defendants, they requested that the Closing Agent Defendants send a list of active files with updates on a weekly basis. Remedios warned Nguyen to be careful because if "we don't have good updates this will get escalated to Saurabh."

523. The sale ultimately closed on August 20, 2020 at an effective final sale price of $299,000, which included the fraudulent $26,000 seller credit unilaterally approved by Remedios for the benefit of Chinapen and Ramgobin.

524. But for the 10 Hollywood Avenue Fraud, the seller would not have agreed to the sale to Ramgobin (via 10 Hollywood Group Corp).

525. Voro LLC (Chinapen) served as the buyer's agent in connection with the transaction, Torres served as the listing agent, and Sheldon May served as the closing agent. All of them acted on behalf of Defendants' fraudulent conspiracy and criminal enterprise in their actions relating to the sale of the 10 Hollywood Avenue property.

526. Chinapen or his agent paid an illegal $5,000 kickback payment to Remedios as compensation for his criminal conduct to facilitate the unlawful sale of the 10 Hollywood Avenue property to Ramgobin (via 10 Hollywood Group Corp), in furtherance of Defendants' fraudulent conspiracy and criminal enterprise.

527.    But for the fraudulent conduct of defendants Voro LLC, Chinapen, 10 Hollywood Group Corp, Ramgobin, Remedios, Torres, Malilay, and the Closing Agent Defendants, the 10 Hollywood Avenue property would have sold for at least $353,849.

528.    But for the fraudulent conduct of defendants Voro LLC, Chinapen, 10 Hollywood Group Corp, Ramgobin, Remedios, Torres, Malilay, and the Closing Agent Defendants, plaintiff AOA would have received a larger buyer's premium and plaintiff RHSS would have received a larger commission based upon the difference between the price that the property should have sold for and the actual sale price that defendants Voro LLC, Chinapen, 10 Hollywood Group Corp, Ramgobin, Remedios, Torres, Malilay, and the Closing Agent Defendants procured through their concerted fraud.

*11 Booth Street, Hempstead, NY*

529.    Using deceit and artifice, Ramgobin purchased the property located at 11 Booth Street in Hempstead, New York outside the normal process on the Hubzu platform for $15,000 less than a legitimate bidder had offered to pay.

530.    When the final auction cycle for the property started, the list price was $190,800, the starting bid price was $134,000, and the seller's confidential reserve price was $169,812.

531.    The highest bid by a bona fide third party bidder in the final auction was $180,000, which was above the seller's reserve price.

532.    Sometime on or before May 28, 2020, Remedios, Malilay or Torres facilitated the disclosure of the seller's confidential reserve price to Chinapen and Ramgobin.

533.    On May 28, 2020, in furtherance of Defendants' fraudulent conspiracy and criminal enterprise, defendant Tung Nguyen, using wires across international and/or state lines,

emailed Remedios and stated that an "investor" was interested in purchasing the 11 Booth Street property for $165,000.

534.    Although Remedios should have sought to secure a PSA with the prevailing bidder for $180,000, Remedios, in furtherance of Defendants' fraudulent conspiracy and criminal enterprise, requested approval to accept the $165,000 offer from Ramgobin, which was below the seller's confidential reserve price.

535.    In response to the request, Remedios's supervisor directed Remedios to make a counter offer of $170,000, which was above the seller's confidential reserve price.  Remedios responded that he expected the buyer (Ramgobin) would agree to pay $170,000 because she was a "regular buyer."

536.    On information and belief, Remedios falsely represented to his supervisor that he believed the buyer would agree to the counter offer of $170,000 because Remedios intended to apply a fraudulent $5,000 seller credit to reduce the effective purchase price to $165,000, just as Ramgobin and Chinapen wanted and directed.

537.    Indeed, on May 29, 2020, Remedios emailed Nguyen and advised her that the $165,000 offer was accepted.

538.    Remedios manipulated the Hubzu platform to manually approve a $170,000 offer from Ramgobin, which Remedios could accept without requesting approval from the seller because the offer was above – *by less than $200* – the seller's confidential reserve price.

539.    Although he had a duty to do so, Remedios knowingly and purposefully did not disclose to the seller that a legitimate bidder had submitted a bid for $10,000 more than the offer from Ramgobin (the "11 Booth Fraud No. 1").  Remedios did not disclose that information for the specific purpose of aiding and abetting defendants Ramgobin and Chinapen in their

fraudulent conspiracy so they could purchase the property for $15,000 less than a legitimate buyer would have otherwise paid for it.

540.    The seller would not have accepted Ramgobin's $170,000 offer but for the 11 Booth Fraud No. 1.

541.    On May 29, 2020, Ramgobin formed defendant Booth11 Group Corp, a New York corporation, to consummate Defendants' fraudulent conspiracy by serving as the entity that would purchase the 11 Booth Street property.

542.    On June 15, 2020, Ramgobin, on behalf of Booth11 Group Corp, signed a PSA to acquire the 11 Booth Street property.

543.    Prior to closing, on August 21, 2020, Remedios, acting on behalf of Chinapen, Ramgobin and in furtherance of Defendants' fraudulent conspiracy and criminal enterprise, manually approved a $5,000 seller credit in favor of Booth11 Group Corp that Remedios and Allysa Nguyen falsely represented was needed because the lender reduced the loan amount and the funds were needed to close  (the "11 Booth Fraud No. 2" and, collectively with the 11 Booth Fraud No. 1, the "11 Booth Fraud").

544.    Chinapen, Ramgobin, Remedios and Allysa Nguyen knew the 11 Booth Fraud No. 2 was false at the time because they knew that there was no legitimate basis for the $5,000 seller credit Remedios approved.

545.    Because the Hubzu platform did not require Remedios to obtain the seller's approval to issue this particular seller credit, Remedios did not seek or obtain the seller's approval.

546.    The sale closed on August 26, 2020 at an effective final sale price of $165,000, which included the fraudulent $5,000 seller credit unilaterally approved by Remedios for the benefit of Chinapen and Ramgobin.

547.    But for the 11 Booth Fraud, the seller would not have agreed to the sale to Ramgobin (via Booth11 Group Corp).

548.    Voro LLC (Chinapen) served as the buyer's agent in connection with the transaction and Sheldon May served as the closing agent.  All of them acted on behalf of Defendants' fraudulent conspiracy and criminal enterprise in their actions relating to the sale of the 11 Booth Street property.

549.    Chinapen or his agent paid an illegal $3,000 kickback payment to Remedios as compensation for his criminal conduct to facilitate the unlawful sale of the 11 Booth Street property to Ramgobin (via Booth11 Group Corp), in furtherance of Defendants' fraudulent conspiracy and criminal enterprise

550.    But for the fraudulent conduct of defendants Voro LLC, Chinapen, Booth11 Group Corp, Ramgobin, Remedios, Malilay, and the Closing Agent Defendants, the 11 Booth Street property would have sold for $180,000.

551.    But for the fraudulent conduct of defendants Voro LLC, Chinapen, Booth11 Group Corp, Ramgobin, Remedios, Malilay, and the Closing Agent Defendants, plaintiff AOA would have received a larger buyer's premium and plaintiff RHSS would have received a larger commission based upon the difference between the price that the property should have sold for and the actual sale price that defendants Voro LLC, Chinapen, Booth11 Group Corp, Ramgobin, Remedios, Malilay, and the Closing Agent Defendants procured through their concerted fraud.

*4 Chips Court, Port Jefferson, NY*

552.    Using deceit and artifice, Ramgobin purchased the property located at 4 Chips Court in Port Jefferson, New York outside the normal process on the Hubzu platform for nearly $9,000 less than she should have paid.

553.    When the final auction cycle for the property started, the list price was $361,200, the starting bid price was $260,000, and the seller's confidential reserve price was $328,692.

554.    Sometime on or before June 19, 2020, Remedios, Malilay or Torres facilitated the disclosure of the seller's confidential reserve price to Chinapen and Ramgobin.

555.    On June 19, 2020, defendant Allysa Nguyen emailed Remedios, in furtherance of Defendants' fraudulent conspiracy and criminal enterprise, using wires across international and/or state lines, and advised Remedios that she had "just been contacted by an investor" (Ramgobin) who wanted to buy the 4 Chips Court property for $335,000.  Two hours later, Remedios advised Nguyen via email that the offer was approved.

556.    On June 22, 2020, Ramgobin formed defendant Chips Court Group Corp, a New York corporation, to consummate Defendants' fraudulent conspiracy by serving as the entity that would purchase the 4 Chips Court property.

557.    On June 24, 2020, Ramgobin, on behalf of Chips Court Group Corp, signed a PSA to acquire the 4 Chips Court property.

558.    Prior to closing, on August 25, 2020, Remedios, acting on behalf of Chinapen, Ramgobin and in furtherance of Defendants' fraudulent conspiracy and criminal enterprise, manually approved a $7,000 seller credit in favor of Chips Court Group Corp that Remedios falsely represented was for the purpose of compensating the buyer for the cost of purported necessary repairs to the property or some other false and contrived justification (the "Chips Court Fraud").

559.    Chinapen, Ramgobin and Remedios knew the Chips Court Fraud was false at the time because they all knew that the property did not need $7,000 in repairs, nor was there any other legitimate basis for the $7,000 seller credit Remedios approved.

560.    Because the Hubzu platform did not require Remedios to obtain the seller's approval to issue this particular seller credit, Remedios did not seek or obtain the seller's approval.

561.    The sale closed on August 31, 2020 at an effective final sale price of $328,000, which included a reduction of $7,000 for the fraudulent and fabricated seller credit Remedios applied.

562.    Voro LLC (Chinapen) served as the buyer's agent in connection with the transaction, and Sheldon May served as the closing agent. All of them acted on behalf of Defendants' fraudulent conspiracy and criminal enterprise in their actions relating to the sale of the 4 Chips Court property.

563.    Upon information and belief, Chinapen or his agent paid an illegal kickback payment to Remedios as compensation for his criminal conduct to facilitate the unlawful sale of the 4 Chips Court property to Ramgobin (via Chips Court Group Corp), in furtherance of Defendants' fraudulent conspiracy and criminal enterprise

564.    But for the fraudulent conduct of defendants Voro LLC, Chinapen, Chips Court Group Corp, Ramgobin, Remedios, Malilay, and the Closing Agent Defendants, the 4 Chips Court property would have sold for at least $336,942.

*12 Great Neck Court, Huntington, NY*

565.     Using deceit and artifice, Ramgobin purchased the property located at 12 Great Neck Court in Huntington, New York outside the normal process on the Hubzu platform for $28,500 less than a legitimate bidder had offered to pay.

566.     When the final auction cycle for the property started, the list price was $621,100, the starting bid price was $419,000, and the seller's confidential reserve price was $558,990.

567.     Sometime on or before June 23, 2020, Remedios, Malilay or Torres facilitated the disclosure of the seller's confidential reserve price to Chinapen and Ramgobin.

568.     On June 23, 2020, in furtherance of Defendants' fraudulent conspiracy and criminal enterprise, defendant Allysa Nguyen emailed Remedios, using wires across international and/or state lines, and advised Remedios that she had "an investor" (Ramgobin) who wanted to buy the 12 Great Neck Court property for $560,000, less than $2,000 above the seller's confidential reserve price. The following day, Remedios advised Nguyen that the offer was approved.

569.     Although he had a duty to do so, Remedios knowingly and purposefully did not disclose to the seller that a legitimate bidder had submitted a bid for $588,500 for the property, which was almost $30,000 higher than Ramgobin's offer (the "12 Great Neck Fraud"). Remedios did not disclose that information at the direction of and/or with the knowledge and assent of Chinapen and Ramgobin, for the specific purpose of aiding and abetting their fraudulent conspiracy and criminal enterprise to purchase the property for almost $30,000 less than a legitimate buyer would have otherwise paid for it.

570.     Remedios, using wires across international and/or state lines, manually accepted the $560,000 offer from Ramgobin that had been submitted outside the Hubzu system.

571.    In reliance on the information provided by Remedios, the seller agreed to accept Ramgobin's $560,000 offer.

572.    The seller would not have accepted Ramgobin's $560,000 offer but for the 12 Great Neck Fraud.

573.    On June 24, 2020, Ramgobin formed defendant Great Neck12 Group Corp, a New York corporation, to consummate Defendants' fraudulent conspiracy by serving as the entity that would purchase the 12 Great Neck Court property.

574.    On June 25, 2020, Ramgobin, on behalf of Great Neck12 Group Corp, signed a PSA to acquire the 12 Great Neck Court property.

575.    The sale closed on August 31, 2020 at a final sale price of $560,000.

576.    Voro LLC (Chinapen) served as the buyer's agent in connection with the transaction, and Sheldon May served as the closing agent. All of them acted on behalf of Defendants' fraudulent conspiracy and criminal enterprise in their actions relating to the sale of the 12 Great Neck property.

577.    Chinapen or his agent paid an illegal $1,000 kickback payment to Remedios as compensation for his criminal conduct to facilitate the unlawful sale of the 12 Great Neck Court property to Ramgobin (via Great Neck12 Group Corp) in furtherance of Defendants' fraudulent conspiracy and criminal enterprise.

578.    But for the fraudulent conduct of defendants Voro LLC, Chinapen, Great Neck12 Group Corp, Ramgobin, Remedios, Malilay, and the Closing Agent Defendants, the 12 Great Neck Court property would have sold for at least $588,500.

579.    But for the fraudulent conduct of defendants Voro LLC, Chinapen, Great Neck12 Group Corp, Ramgobin, Remedios, Malilay, and the Closing Agent Defendants, plaintiff AOA

would have received a larger buyer's premium and plaintiff RHSS would have received a larger commission based upon the difference between the price that the property should have sold for and the actual sale price that defendants Voro LLC, Chinapen, Great Neck12 Group Corp, Ramgobin, Remedios, Malilay, and the Closing Agent Defendants procured through their concerted fraud.

### *670 Elton Street, Brooklyn, NY*

580.    Using deceit and artifice, Defendant Ramgobin purchased the property located at 670 Elton Street in Brooklyn, New York outside the normal process on the Hubzu platform for $72,412 less than its fair market value.

581.    When the final auction cycle for the property started, the list price was $453,200, the starting bid price was $318,000 and the seller's confidential reserve price was $412,412.

582.    Remedios, using wires across international and/or state lines, contacted the seller and asked if the seller would accept an offer of $365,000 from defendant Ramgobin submitted manually outside the Hubzu platform.  Indeed, on April 2, 2020, in furtherance of Defendants' fraudulent conspiracy and criminal enterprise, defendant Alyssa Nguyen, using wires across international and/or state lines, emailed Remedios and stated that an "investor" was willing to purchase the 670 Elton Street property for $365,000. On the same date, defendant Remedios responded to Allyssa Nguyen via email across international and/or state lines asking for the buyer's information, which was provided by Nguyen on the same date.

583.    On April 2, 2020, the same day Alyssa Nguyen emailed Remedios, Ramgobin formed defendant 670 Elton Group Corp as a New York corporation, to consummate Defendants' fraudulent conspiracy by serving as the entity that would purchase the 670 Elton Street property.

584.    On April 6, 2020, Ramgobin, on behalf of 670 Elton Group Corp signed a PSA to acquire the 670 Elton Street property.

585.    Prior to closing, on May 20, 2020, Remedios, acting on behalf of Chinapen, Ramgobin and in furtherance of Defendant's fraudulent conspiracy and criminal enterprise, obtained approval of a $25,000 seller credit in favor of 670 Elton Group Corp that Remedios falsely represented was for a fabricated water issues post-closing (the "670 Elton Fraud").

586.    Chinapen, Ramgobin and Remedios knew that the 670 Elton Fraud was false at the time because they knew there was no basis to support a seller credit of $25,000.

587.    The sale closed on May 22, 2020 at a final effective sale price of $340,000, which reflected the fraudulent $25,000 seller credit Remedios unilaterally approved for the benefit of Ramgobin and Chinapen.

588.    Voro LLC (Chinapen) served as the buyer's agent in connection with the transaction, Torres served as the listing agent, and Sheldon May served as the closing agent.  All of them acted on behalf of Defendants' fraudulent conspiracy and criminal enterprise in their actions relating to the sales of the 670 Elton Street property.

589.    Chinapen or his agent paid an illegal $10,000 kickback payment to Remedios as compensation for his criminal conduct to facilitate the unlawful sale of the 670 Elton Street property to Ramgobin (via 670 Elton Group Corp), in furtherance of Defendants' fraudulent conspiracy and criminal enterprise.

590.    But for the fraudulent conduct of defendants Voro LLC, Chinapen, 670 Elton Group Corp, Ramgobin, Remedios, Torres, Malilay, and the Closing Agent Defendants, the 670 Elton Street property would have sold for at least $412,412.

*37-22 63rd Street, Woodside, NY*

591. Using deceit and artifice, Defendant Ramgobin purchased the property located at 37-22 63rd Street in Woodside, New York outside the normal process on the Hubzu platform for $25,000 less than she should have paid.

592. When the final auction cycle for the property started, the list price was $477,000, the starting bid price was $347,000 and the seller's confidential reserve price was $434,070.

593. On February 14, 2020, Ramgobin, on behalf of 3722 63rd LLC, signed a PSA to acquire the property for $445,070.

594. However, upon information and belief, it was not until February 28, 2020 that defendant 3722 63rd LLC was actually formed by Ramgobin as a New York corporation to consummate Defendants' fraudulent conspiracy by serving as the entity that would purchase the 37-22 63rd Street property.

595. Prior to closing, on or about February 18, 2020, Remedios, acting on behalf of Chinapen, Ramgobin and in furtherance of Defendants' fraudulent conspiracy and criminal enterprise, manually approved a $25,000 seller credit in favor of 3722 63rd LLC that Remedios falsely represented was for the purpose of compensating the buyer for the cost of purported necessary repairs to the property (the "63rd Street Fraud").

596. Chinapen, Ramgobin and Remedios knew the 63rd Street Fraud No. 2 was false at the time because they knew that the property did not need $25,000 in repairs, nor was there any other legitimate basis for the $25,000 seller credit Remedios approved.

597. The sale closed on March 13, 2020 at an effective final sale price of $405,070, which included the fraudulent $25,000 seller credit unilaterally approved by Remedios at the direction of and for the benefit of Chinapen and Ramgobin.

598.    But for the 63rd Street Fraud, the seller would not have agreed to the sale to Ramgobin (via 3722 63rd LLC).

599.    Voro LLC (Chinapen) served as the buyer's agent in connection with the transaction, Torres served as the listing agent, and Sheldon May served as the closing agent. All of them acted on behalf of Defendants' fraudulent conspiracy and criminal enterprise in their actions relating to the sale of the 3722 63rd Street property.

600.    Chinapen or his agent paid an illegal $5,000 kickback payment to Remedios as compensation for his criminal conduct to facilitate the unlawful sale of the 3722 63rd Street property to Ramgobin (via 3722 63rd LLC) in furtherance of Defendants' fraudulent conspiracy and criminal enterprise.

601.    But for the fraudulent conduct of defendants Voro LLC, Chinapen, 3722 63rd LLC, Ramgobin, Remedios, Malilay, and the Closing Agent Defendants, the 37-22 63rd Street property would have sold for at least $434,070.

602.    The 912 E. 15th Street Fraud, 2 Old Estate Fraud, 14 Potters Lane Fraud, 144 Stone Fraud, 2068 Arthur Fraud, 1880 Longfellow Fraud, 38 Horn Fraud, 37 Canterbury Drive Fraud, 865 Edward Fraud, Daniel Crescent Fraud, 1138 Ossipee Fraud, 204 1st Avenue Fraud, 48 Twin River Fraud, Robby Lane Fraud, 155 Lincoln Avenue Fraud, 38 Leland Fraud, 26 Oak Fraud, 25 Parma Fraud, 83rd Street Fraud, 170 N Spur Fraud, 100 Rose Fraud, 612 Miller Fraud, Seaford Fraud, 10 Hollywood Fraud, 11 Booth Fraud, Chips Court Fraud, 12 Great Neck Fraud, 670 Elton Fraud, and 63rd Street Fraud are referred to herein collectively as the "Fraudulent Representations."

603.    Each of the Fraudulent Representations was made on behalf of and for the benefit of the Defendants' fraudulent conspiracy and criminal enterprise.

604.    Plaintiffs now bring this action to recover their damages and the Impacted Properties through claims for: (1) RICO violations; (2) RICO conspiracy; (3) civil conspiracy; (4) fraud; and (5) violations of New York's General Business Law § 349.

605.    Plaintiffs have retained the undersigned law firm and are obligated to pay a reasonable fee for its services.

**FIRST CLAIM FOR RELIEF**
**VIOLATION OF RICO, 18 U.S.C. § 1962(c)**
*(against all Defendants)*

606.    Plaintiffs repeat and reallege each and every allegation contained in the above paragraphs of this Complaint as though fully set forth herein.

607.    Starting in or around January of 2020, Defendants conspired to devise and execute a criminal enterprise to procure the sale of properties for less than fair market value by manipulating the Hubzu auction platform and making fraudulent statements to sellers and other interested parties.  Defendants' enterprise lasted until September of 2020 when the fraudulent scheme was uncovered.  This enterprise lasted for at least seven (7) months so it was of sufficient duration to pursue its purpose; indeed, it successfully facilitated the fraudulent purchase of at least the 33 different Impacted Properties, resulting in ill-gotten gains in excess of $2 million.

608.    The association-in-fact of the Buying Agent Defendants, the Buyer Defendants, the Closing Agent Defendants and the Conspiring Employee Defendants constitutes an "enterprise" engaged in and affecting interstate and foreign commerce within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

609.    The enterprise was continuous in that it lasted for more than seven (7) months, it had ascertainable structure, and it acted in ways distinct from the predicate offenses that Plaintiffs allege.  The enterprise was continuous for the additional reason that the predicate acts

were a regular way of conducting Defendants' ongoing business and of conducting or participating in the ongoing RICO enterprise.

610.   The principal purpose of the enterprise was to facilitate the purchase of residential properties through the Hubzu auction platform and/or outside the Hubzu auction platform at significantly lower prices than genuine bidders were willing and able to pay for the properties and/or at prices below fair market value, thereby depriving the sellers and Plaintiffs of their rightful proceeds, commissions and fees.   Through this fraudulent scheme the enterprise benefitted, without limitation, in each of the following ways: (i) the Buyer Defendants were able to purchase properties at prices below their fair market values and/or at prices lower than bona fide competitive bidders offered; and (ii) the Closing Agent Defendants and Conspiring Employee Defendants received valuable consideration for their efforts in furtherance of the conspiracy, including fees and illegal "kickback" payments.

611.   Operating through the enterprise, Defendants engaged in a pattern of racketeering activity, beginning in or around January of 2020, and continuing through at least September of 2020, posing a continued threat of criminal activity extending indefinitely into the future. Indeed, the Buyer Defendants were able to purchase thirty-three (33) Impacted Properties at prices below fair market value and/or below higher competing bids from bona fide third party bidders, and but for Plaintiffs' investigation and discovery of the scheme, Defendants would undoubtedly have continued their fraudulent conduct to facilitate the purchase of countless other properties.

612.   Each of the Defendants is a "person" within the meaning of 18 U.S.C. § 1961(3), and is separate from the enterprise.

613.   Defendants were critical and willing participants in the racketeering scheme at

issue.

614.     By enlisting the Conspiring Employee Defendants to assist with the scheme, the Buying Agent Defendants, the Buyer Defendants and the Closing Agent Defendants enabled the enterprise to thrive.

615.     Among other fraudulent acts: (1) the Conspiring Employee Defendants made the Fraudulent Representations using wires across international and state lines; (2) the Conspiring Employee Defendants divulged and shared confidential property information, including property pricing information with the Buying Agent Defendants, the Buyer Defendants and the Closing Agent Defendants to facilitate their scheme; (3) the Conspiring Employee Defendants misrepresented property values and market prices to sellers to enable the Buyer Defendants to purchase the Impacted Properties; (4) Defendants colluded with each other to ensure the Buyer Defendants could purchase the Impacted Properties at significantly discounted prices; and (5) Defendants wrongfully rigged Hubzu auctions in order to permit the Buying Agent Defendants and the Buyer Defendants to appear as the highest bidders and enable the Buyer Defendants to purchase properties.  Additionally, Defendants worked together to enable the Buying Agent Defendants and the Buyer Defendants to place fraudulent bids on properties to facilitate the sale of properties to the Buyer Defendants.

616.     Defendants' scienter is established by the foregoing pattern of intentional and knowing fraudulent material misrepresentations and omissions.

### *Defendants Engaged In a Pattern of Racketeering Activity*

617.     Defendants engaged in a pattern of racketeering activity involving their purchase of, at a minimum, 33 Impacted Properties over a nine (9) month period based upon the occurrence of the predicate acts described below.

618.    Defendants racketeering acts were related to one another and formed a pattern of racketeering activity: (a) they were in furtherance of a common goal to enable the Buyer Defendants to purchase the Impacted Properties at significantly discounted prices below fair market value and for all Defendants to profit from those sales; (b) they used similar methods to perpetrate the fraudulent purchases, including fraudulent bidding practices, the improper sharing of confidential property information, including property pricing information, and misstatements and misrepresentations made to sellers to facilitate property sales; (c) they involved the same participants; and (d) they involved similarly situated victims, including both plaintiff AOA and plaintiff RHSS.

619.    The racketeering activity, including the predicate acts, extended over a substantial period of time, beginning in January of 2020, or earlier, and continuing through September of 2020. Additionally, the racketeering acts were sufficiently continuous, and were a regular, indeed critical way of conducting Defendants' ongoing business of conducting and participating in the ongoing RICO enterprise.

620.    Defendants profited from the fraudulent scheme in an amount to be determined through discovery and at trial.

### The Defendants Committed Numerous Predicate Acts

621.    Defendants committed numerous predicate acts of racketeering activity in connection with the enterprise within the meaning of 18 U.S.C. § 1961(1), including without limitation, numerous and repeated violations of 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud).

### Violations of 18 U.S.C. § 1343

622.    Section 1343 outlaws the use of "wire, radio, or television communication in

interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice."

623.    Defendants, having devised the scheme or artifice to defraud, and/or to obtain money or property by means of false or fraudulent pretenses, representations, or promises, transmitted or caused to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce writings, signs, signals, pictures or sounds for the purpose of executing such scheme or artifice, including, but not limited to, each of the Fraudulent Representations.

624.    Each of the Defendants knew, expected, reasonably foresaw, and intended that the foregoing transmissions, including each of the Fraudulent Representations, sent by means of wire, radio or television communication in interstate or foreign commerce, would be used in furtherance of their racketeering scheme, and that such use was an essential part of their scheme.

625.    Plaintiffs, as well as their seller clients were injured by Defendants' fraudulent conduct and racketeering scheme.

626.    Specifically, plaintiff AOA receives a buyer's premium on property sales through Hubzu based upon the final sale price of the property.  AOA suffered damages equal to the difference between the buyer's premiums AOA should have received if the property had been sold at the highest bona fide bid by a competitive bidder and/or for fair market value, and the buyer's premium that AOA actually received as a result of Defendants' fraudulent scheme.

627.    Plaintiff RHSS receives a commission on property sales based upon the sales price, and so incurred damages equal to the difference between the commission RHSS should have received and the lesser commission RHSS actually received as a result of Defendants' fraudulent scheme.

628.     Additionally, Plaintiffs have suffered damages including but not limited to damages to Plaintiffs' reputation, goodwill and lost sales all as a result of Defendants' fraudulent scheme.

629.     By reason of Defendants' violations of 18 U.S.C. § 1962(c), Plaintiffs are entitled to recover treble damages, interest, costs, and reasonable attorneys' fees.

**SECOND CLAIM FOR RELIEF**
**RICO CONSPIRACY, 18 U.S.C. § 1962(d)**
(*against all Defendants*)

630.     Plaintiffs repeat and reallege each and every allegation contained in the above paragraphs of this Complaint as though fully set forth herein.

631.      Defendants violated 18 U.S.C. § 1962(d) by conspiring with each other to commit the actions detailed in this Complaint in violation of 18 U.S.C. § 1962(c).

632.      Defendants conspired with each other to commit the predicate acts described above in furtherance of their scheme to purchase the Impacted Properties.  Each of these members of the conspiracy, by the nature of their positions in the racketeering enterprise, including defendant Chinapen as the "mastermind" of the scheme, knew of the nature of the conspiracy and facilitated its furtherance.

633.     As alleged herein, the conspiracy was initiated by the agreement of Defendants beginning in or around January of 2020 and continuing through at least September of 2020.

634.     Defendants initiated the conspiracy when they agreed to work together to, among other things: (a) share confidential property information including property pricing information; (b) manipulate Hubzu auctions; (c) misrepresent property values to sellers; (d) make each of the Fraudulent Representations; and (e) place fraudulent bids on properties, all for the purpose of profiting from fraudulent sales of each of the Impacted Properties.  Defendants knew of the facts

and circumstances described above including that their actions were fraudulent.

635.   Each of the Defendants was aware of the participation of the other Defendants and each of the Defendants knew the nature of the conspiracy to manipulate the Hubzu auction process for their own benefits.

636.   Defendants conspired to manipulate Hubzu auctions and property sales to permit the Buyer Defendants to purchase the Impacted Properties at discounted prices, to establish and maintain practices to do so, and to reap the benefits therefrom.  The purpose of the enterprise, and thus the conspiracy, was to facilitate the sale of the properties to the Buyer Defendants at prices below fair market value and/or below a higher competing bid from a bona fide third party bidder, which enabled the Buying Agent Defendants, the Closing Agent Defendants and the Conspiring Employee Defendants to benefit financially from the sales.  Thus, Defendants knew that the enterprise would be operated through a pattern of racketeering activity, and each of the Defendants committed numerous predicate acts in furtherance of the fraudulent scheme.

637.   None of the Defendants withdrew or otherwise dissociated themselves from the conspiracy or the other conspirators.

638.   By reason of Defendants' violations of 18 U.S.C. § 1962(d), Plaintiffs are entitled to recover treble damages, interest, costs, and reasonable attorneys' fees.

### THIRD CLAIM FOR RELIEF
### CIVIL CONSPIRACY
(*against all Defendants*)

639.   Plaintiffs repeat and reallege each and every allegation contained in the above paragraphs of this Complaint as though fully set forth herein.

640.   Beginning in or around January of 2020, through September of 2020, Defendants made an agreement and devised a scheme to defraud Plaintiffs and the sellers by manipulating

property auctions to allow the Buyer Defendants to purchase properties for less than their fair market value and/or less than higher competing bids submitted by bona fide third parties.

641.    Defendants initiated the conspiracy when they agreed to work together to, among other things: (a) share confidential property information including property pricing information; (b) manipulate Hubzu auctions; (c) misrepresent property values to sellers; (d) make each of the Fraudulent Representations; and (e) place fraudulent bids on properties, all for the purpose of profiting from fraudulent sales of each of the Impacted Properties.  Defendants knew of the facts and circumstances described above including that their actions were fraudulent.

642.    Defendants overtly participated in the agreement and plan by knowingly colluding with each other to enable the Buyer Defendants to purchase the Impacted Properties with the Buying Agent Defendants, the Closing Agent Defendants and the Conspiring Employee Defendants reaping the benefits of the sales through commissions and kickbacks.

643.    The fraudulent scheme carried out by Defendants enabled the Buyer Defendants to purchase the Impacted Properties by circumventing the legitimate Hubzu bidding process and enabled the Buying Agent Defendants, the Closing Agent Defendants and the Conspiring Employee Defendants to receive commissions and kickbacks from the property sales.

644.    Crimes were committed when Defendants: (a) shared confidential property information including property pricing information; (b) manipulated Hubzu auctions; (c) misrepresented property values to sellers; (d) made each of the Fraudulent Representations; and (e) received illegal kickback payments from Chinapen or his agents.

645.    Plaintiffs' reputation and goodwill have been harmed by Defendants' conduct.

646.    Plaintiffs were further harmed because they have existing relationships with sellers on Hubzu who expect the Hubzu auctions to be free from fraud and expect Plaintiffs to

assist in facilitating property sales at the highest possible sale prices.  However, as a result of Defendants' conduct, including the Fraudulent Representations that were made to the sellers, sellers were fraudulently induced to sell the Impacted Properties at prices below fair market value and/or higher bid amounts submitted by bona fide third party bidders through the Hubzu platform.

647.    Furthermore, Plaintiffs receive commissions, premiums and fees based upon the sales price of properties, and so incurred damages equal to the difference between the commissions, premiums and fees Plaintiffs should have received and what Plaintiffs actually received as a result of Defendants' fraudulent scheme.

**FOURTH CLAIM FOR RELIEF**
**COMMON LAW FRAUD**
(*against all Defendants*)

648.    Plaintiffs repeat and reallege each and every allegation contained in the above paragraphs of this Complaint as though fully set forth herein.

649.    Upon information and belief, beginning in or around January of 2020, or earlier, through September of 2020, Defendants engaged in a scheme to defraud Plaintiffs and their seller clients through each of the Fraudulent Representations.

650.    Defendants acted with knowledge their scheme was fraudulent and intended to defraud Plaintiffs as well as the sellers by and through each of the Fraudulent Representations.

651.    Defendants' Fraudulent Representations induced Plaintiffs to continue to employ the Conspiring Employee Defendants, despite their Fraudulent Representations that caused Plaintiffs to suffer actual damages.

652.    Defendants' Fraudulent Representations induced Plaintiffs' seller clients to sell the Impacted Properties for below fair market value and/or below higher competing bids from

bona fide third parties.

653.    Plaintiffs and their seller clients reasonably and justifiably relied upon Defendants' Fraudulent Representations.

654.    Defendants' conduct of defrauding Plaintiffs consisted of gross, wanton and willful fraud and involved a high degree of moral culpability.

655.    By reason of the foregoing, Plaintiffs are entitled to recover damages, interest, costs, and reasonable attorneys' fees.

**FIFTH CLAIM FOR RELIEF**
**VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349**
(*against all Defendants*)

656.    Plaintiffs repeat and reallege each and every allegation contained in the above paragraphs of this Complaint as though fully set forth herein.

657.    Defendants violated § 349 by engaging in the deceptive and misleading acts, practices and representations described herein.

658.    Defendants committed deceptive and misleading acts, practices and representations in the conduct of their ongoing scheme throughout the State of New York.

659.    Defendants engaged in a scheme to defraud Plaintiffs, the sellers, participants in Hubzu auctions, and the public generally, by manipulating Hubzu auction pricing, fraudulently bidding on properties to prevent other consumers from rightfully purchasing those properties, manipulating residential property prices and property values, and by making each of the Fraudulent Representations.

660.    Defendants' deceptive and misleading acts, practices, and representations are consumer oriented and directly impacted the public as Defendants, among other things, prevented other consumers from lawfully purchasing properties through the Hubzu platform by

manipulating the process.

661.   Defendants' Fraudulent Representations induced Plaintiffs to continue to employ the Conspiring Employee Defendants, despite their Fraudulent Representations that caused Plaintiffs to suffer actual damages.

662.   Defendants' Fraudulent Representations induced Plaintiffs' seller clients to sell the Impacted Properties for below fair market value and/or below higher competing bids from bona fide third parties.

663.   Plaintiffs would not have continued to do business with the Buying Agent Defendants, the Buyer Defendants and/or the Closing Agent Defendants nor continued to employ the Conspiring Employee Defendants but for Defendants' deceptive and misleading acts, practices and representations described herein, including but not limited to each of the Fraudulent Representations.

664.   As a direct and proximate result of Defendants' deceptive and misleading acts, practices, and representations as described herein in violation of New York General Business Law § 349, Plaintiffs have suffered significant damages and are entitled to such damages from Defendants, jointly and severally, including actual damages, statutory damages, and reasonable attorneys' fees.

## PRAYER FOR RELIEF

Wherefore, plaintiffs Altisource Online Auction, Inc. and REALHome Services and Solutions, Inc. respectfully request that the Court enter judgment awarding:

(a) Actual damages, statutory damages, treble damages, punitive damages and such other relief as provided by the statutes cited herein;

(b) Treble damages and attorneys' fees under 18 U.S.C. § 1962(c);

(d) Reasonable attorneys' fees, costs, expenses, and disbursements; and

(e) Such other relief in favor of Plaintiffs as the Court deems just and proper.

DATED:  February 23, 2021        Respectfully submitted,

**GREENSPOON MARDER LLP**

*/s/ Daniel C. Mazanec*
DANIEL C. MAZANEC
New York Bar No.: 4646956
600 Brickell Avenue, Suite 3600
Miami, FL 33131
(305) 789-2720

RASPREET BHATIA
New York Bar No.: 5486451
590 Madison Ave Ste 1800
New York, NY 10022-2524
(212) 524-5000

*Attorneys for Plaintiffs Altisource S.à r.l.,*
*Altisource Online Auction, Inc. and REALHome*
*Services and Solutions, Inc.*